(June 30, 1988)

■ SIXTO R. BENITEZ, Respondent, v NEW YORK CITY BOARD OF EDUCATION et al., Appellants, et al., Defendant.—Judgment, Supreme Court, Bronx County (Hansel McGee, J.), entered June 10, 1986, which, after a jury trial, *inter alia,* awarded plaintiff $946,000 for loss of earnings and $304,000 for pain and suffering, and apportioned liability 30% against plaintiff and 70% against defendants, affirmed, without costs or disbursements.

This personal injury action is an outgrowth of injuries sustained by plaintiff, a 19-year-old football player at George Washington High School (GW), during the course of a league game in A Division competition. He has sued both the New York City Board of Education and the Public Schools Athletic League of the City of New York alleging, *inter alia,* negligence

on the part of the coach and principal of GW in permitting him to play in a "mismatched" game, and in a fatigued condition.

The record discloses that GW's principal, after a disastrous 1982 season in A Division play, requested a transfer to B Division, citing GW's poor record and its toll of injuries. The request was rejected, not on the merits, but because of a supposed two-year prohibition against such transfers which, as it turned out, was honored in the breach. The principal appealed, arguing that GW's continuance in the same division was "unsafe." The denial of that appeal was taken to Angelo Aponte, the Chancellor's representative. Again, the injury factor was cited, with the caution that, unless transferred back to the B Division, GW might suffer "an additional string of serious injuries to our players." In a second letter the principal argued that GW's players were being asked to "stay another year and shoulder inevitable injuries * * * against some of the most powerful football teams in the City." The latter appeal was also denied.

After the "painful" decision to play the 1983 schedule was made, GW's new principal spoke to Coach Walsh who expressed the opinion that the John F. Kennedy High School (JFK) game should not be played and that there "was a very high risk of injury." Even JFK's principal concurred in that view and wrote to that effect. Speaking of his own school, he noted, "Just in sheer numbers, [we] were able to go out on a field and have fresh kids out there all the time."

The incident itself occurred just 1 minute and 17 seconds prior to the end of the first half and in the 56th play of that half. GW was on the receiving end of a kickoff. Plaintiff's assignment was to circle around and block any JFK lineman trying to tackle the GW receiver. As plaintiff described the play, the other guy "just run me over: I just poof." Plaintiff testified that he was tired when the injury occurred, although he had never complained to Coach Walsh. Of the 56 plays up to that point, plaintiff had played in all but 9, as indicated in the game film (which was not of the best quality), or 1, as he and Coach Walsh testified. Plaintiff also maintained, contrary to defendants' proof, that, at the time of the injury, he had maintained his head in the proper blocking position. To an extent, this claim was supported by his medical expert. According to the coach, plaintiff played virtually the entire game because he had no replacement for him except a 110-pound boy who was "physically incapable of competing in that kind of competition." Plaintiff's experts testified that a mismatch or

playing while tired increases the risk of injury. Coach Walsh knew that it was unsafe for plaintiff to be "out there playing as they were playing", i.e., both ways, offense and defense, full time. Dr. Warren, defendants' expert, conceded that "[t]iredness * * * would affect the coordination level of a player."

It is well settled that a school has a duty to supervise the activities of the students in its charge. *(Cavello v Sherburne-Earlville Cent. School Dist.,* 110 AD2d 253, 255, *lv dismissed* 67 NY2d 601.)* That the student is engaged in supervised interscholastic varsity sports does not lessen the school's duty. *(See, e.g., Ehlinger v Board of Educ.,* 96 AD2d 708.) Whether the actions of a school or school board are adequate and reasonable and, if not, whether its negligence was a proximate cause of an accident are almost always questions of fact. *(See, e.g., Decker v Dundee Cent. School Dist.,* 4 NY2d 462, 464; *Merkley v Palmyra-Macedon Cent. School Dist.,* 130 AD2d 937, 938.)* For an act to be deemed a proximate cause it must be shown to have been a " 'substantial cause of the events which produced the injury' " *(Boltax v Joy Day Camp,* 67 NY2d 617, 619, quoting *Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315). Even though an activity may carry with it a certain risk of harm, where the defendant has acted in such a way as substantially to enhance or increase the likelihood of harm that may befall a participant, the defendant's conduct is actionable. *(Humphrey v State of New York,* 90 AD2d 901, *affd* 60 NY2d 742; *Hulett v State of New York,* 4 AD2d 806, 807.)

The evidence here indicates that defendants unreasonably enhanced or increased the risk of plaintiff being injured by playing him in a game between mismatched teams and by playing him for virtually the entire game, while he was tired, because there was no adequate substitute for him. While plaintiff was a voluntary participant in the game, never having complained of being tired, the law does recognize, especially in student-teacher relationships, that a degree of indirect compulsion exists, nonetheless. *(See, e.g., Verduce v Board of Higher Educ.,* 8 NY2d 928; *Yarborough v City Univ.,* 137 Misc 2d 282.)* The rationale is that the student is understandably reluctant to refuse to participate for fear of the negative impact such refusal might have on his or her grade or standing. Such reasoning applies here. Plaintiff was "one of the best football players to come out of GW"; he had a "drawer full" of letters from colleges. In such circumstances, it is not at all surprising nor legally fatal to his cause that plaintiff had not asked to be taken out of the game.

Our analysis of the record reveals sufficient competent

evidence which, if accepted, makes out a prima facie case that defendants were negligent in permitting plaintiff to play in a game in which his team was greatly outmatched and in circumstances in which the likelihood of his being injured was significantly enhanced. The question of plaintiff's own negligence was, of course, submitted to the jury, which assessed it at 30%.

Defendant's dire forecast that a finding of liability here will open the floodgates and lead inevitably to the total collapse of the Board of Education's interscholastic sports program is somewhat overstated, to say the least. This is an unusual case, one in which the very incident which occurred was predicted. Concur—Sandler, Sullivan and Rosenberger, JJ.

Murphy, P. J., dissents in a memorandum as follows: Because the evidence establishes that the injury to the plaintiff resulted from the risks ordinarily attending participation in a football game and, even more basically, that defendants were not guilty of breaching any duty to the plaintiff, I dissent and would dismiss the complaint.

On October 22, 1983, plaintiff, a 19-year-old high school senior and a team member of the George Washington High School (GW) varsity football team, was seriously injured while blocking an opponent on the John F. Kennedy High School (JFK) varsity football team. Both teams were members of the A Division.

During the 1982 season, GW lost all of its seven games and its players sustained 14 injuries, typically associated with the sport of football. The first three games of the 1983 season were "competitive". The fourth game, against JFK, was the game in which plaintiff sustained his injury. Plaintiff was injured near the end of the first half of the game when he blocked an opposing player during a "kickoff return". The opponent was only three inches taller and 12 pounds heavier than plaintiff, and, as described by his own coach, was of "marginal ability." According to plaintiff, "I block him, and poof. And I had—he just run me over: I just poof".

Defendants attributed the injury to improper blocking by the plaintiff: "spearing" or "butt" blocking. Plaintiff claimed he properly blocked the opponent, but was fatigued. Plaintiff contended that the Board of Education and Public Schools Athletic League (PSAL) had been negligent in placing and maintaining the GW team in the A Division for the 1982 and 1983 seasons. Plaintiff further maintained that the principal and the coach had negligently permitted plaintiff to play in a

mismatched game, and that the coach had been additionally negligent in permitting plaintiff to play while fatigued. The jury found defendants liable on all of these theories and awarded plaintiff damages in the gross amount of $946,000 for loss of earnings and $304,000 for pain and suffering. The plaintiff was found to be 30% responsible for his injuries with the remaining 70% liability apportioned to defendants.

After the verdict, the trial court granted defendants' motion to dismiss the two causes of action against the PSAL predicated on the placement of the team in the A Division, but sustained the verdict insofar as it rested on the findings of negligence against the principal and coach.

On appeal, defendants maintain that there was no evidence of any negligence by defendants and that the suit should therefore have been dismissed, in its entirety.

While it is well established that a school must supervise the activities of its students, the standard of care required of the school is not as well settled. The New York Court of Appeals has imposed a duty upon a teacher to exercise "reasonable care" while supervising students *(Govel v Board of Educ.,* 267 App Div 621, 624, *affd* 293 NY 928), but on occasion has also imposed a more demanding "ordinary prudent parent" standard. *(Lawes v Board of Educ.,* 16 NY2d 302, 305.) A review of the cases which apply both of these standards reveals that they exclusively address situations which have occurred during regular school hours when the student is required to participate in school activities.

As the instant controversy concerns an occurrence during an extracurricular scholastic sports program, neither of the standards articulated in *Govel (supra)* and *Lawes (supra)* is directly applicable. While it appears that no New York cases have specifically spelled out the standard of care with which school personnel are to be held in such noncompulsory circumstances, it is questionable if the higher standard of care is appropriate. Even if it were applicable, the standard would have to account for the fact that plaintiff, a 19 year old at the time of his injury, was emancipated and therefore required little or no supervision from his parents. *(Cf., Pratt v Robinson,* 39 NY2d 554, 560 [1976].)

In any case, assuming the applicability of the more demanding standard of care, and also assuming that plaintiff's injury was a result of fatigue, there is no evidence which indicates that defendants deviated from the standard of a reasonably prudent parent under the same circumstances.

The evidence proves plaintiff's injury was the result of the risks he assumed when he chose to participate in the sport of football. As Chief Judge Cardozo wrote in *Murphy v Steeplechase Amusement Co.* (250 NY 479, 482): *"Volenti non fit injuria.* One who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary" *(see also, Passantino v Board of Educ.,* 41 NY2d 1022 [1977], *revg* 52 AD2d 935 [2d Dept 1976]). Two such risks of football participation are fatigue and injury.

While plaintiff acknowledges the doctrine of assumption of the risk he urges that the coach was negligent by unreasonably enhancing the risk of injury "by playing him for virtually the entire game (and while he was tired) because there was no substitute for him". *(Cf., Maddox v City of New York,* 66 NY2d 270 [1985].) However, in light of the fact that fatigue and injury were inherent risks assumed by plaintiff, the coach's negligence can only be established if the evidence proves he knew or should have known that playing plaintiff as he did created a risk unknown to plaintiff. *(Supra,* at 279.) Moreover, plaintiff's awareness of the risk must be assessed against the background of his skill and experience. *(Supra.)*

At the time of plaintiff's injury, during the fourth game of the 1983 season, he was in his third year on the football team. He had participated in the vigorous training program at football camp and had trained regularly. Plaintiff admits he was taught the proper blocking techniques and regularly blocked players bigger than himself. In fact, Coach Walsh, whom it is conceded was an expert, highly qualified, competent and effective coach, regularly reviewed the dangers of using an improper head block.

As described by Coach Walsh, plaintiff was "poetry in motion. He was a tremendous athlete. It was even before his senior year, and he received six or seven different offers, from different schools * * * He was blue chip right down the line." The state of plaintiff's physical conditioning was "incredible". Indeed, plaintiff had played, without incident, the entire 1982 season against A Division teams (including JFK). Moreover, plaintiff played on offense, on defense and on special teams in every quarter of each game. In 1983, plaintiff continued his usual practice of playing full games, "both ways" in the first three games of the season.

Under these circumstances, there is no doubt that plaintiff knew what it was like to play a full game, always played a full games and was well accustomed to the fatigue associated

with playing a full game. Clearly, when plaintiff's injury occurred—near the end of the first half of the game against JFK, a team plaintiff had previously played without incident —he was well aware of precisely the physical demands the game would make of him. There is absolutely no evidence that Coach Walsh enhanced plaintiff's risk of injury. Indeed, Coach Walsh played plaintiff as he always had,* plaintiff never indicated that he was more tired than normal, and plaintiff's performance, up to the point of his injury, was up to par.

Consequently, plaintiff's assertion that Coach Walsh knew, or should have known, that it was unsafe to play plaintiff, in the manner that he did, or that plaintiff did not know it was unsafe to be playing as he was playing, is unsupported by the evidence. It is clear that the coach's decision to play plaintiff as he always had did not "amount to such careless disregard for the safety of [plaintiff] as to create risks not fairly assumed [by him]." *(McGee v Board of Educ.,* 16 AD2d 99, 102 [1st Dept 1962], *appeal dismissed* 12 NY2d 1100 [1963].) Thus, plaintiff has not overcome defendants' defense of assumption of the risk.

In a further attempt to defeat the assumption of the risk defense, plaintiff contends that his decision to play in the JFK football game was not voluntary but was made under an implied direction by his coach. Essentially, plaintiff urges that he was "justified in assuming that the coach would not subject him * * * to unsafe conditions" and plaintiff "had no choice but to follow the coach's direction" since, if he did not, it may have had "a negative impact upon a future football career." Plaintiff's theory is based upon the principle explained in *Broderick v Cauldwell-Wingate Co.* (301 NY 182, 188 [1950]) as follows: "when a person in the capacity of a superior assumes control over a workman on a job and directs him to proceed under circumstances recognizable as dangerous, the subordinate workman has little, if any, choice in the matter but to obey it and, if he stays within the limits of the superior's instructions and is injured, he may not be penalized by a claim of contributory negligence as a matter of law."

While this principle may be relevant to a situation where a coach directs his student to play football, notwithstanding the fact that the student is obviously unable to play in the manner directed, the *Broderick* principle is inapplicable to the

---

* While the coach played plaintiff the entire game because he had no replacement for him, he always played plaintiff the entire game, and plaintiff was well accustomed to playing full games.

instant case. *(Cf., Verduce v Board of Higher Educ.,* 8 NY2d 928 [1960]; *Yarborough v City Univ.,* 137 Misc 2d 282 [Ct Cl 1987].)* Here, not only does the record lack evidence of any explicit, or for that matter, implied compulsion for plaintiff to play football, there is no evidence of circumstances so dangerous as to warrant invoking the principle enunciated in *Broderick (supra).*

In sum, while the defense of assumption of the risk is ordinarily a question of fact for the jury, the evidence proves that the defense was clearly established and was not rebutted. Hence, plaintiff has neglected to make out a prima facie case of negligence: there is in fact, no proof that plaintiff's injury was a result of defendants' negligence. *(See, Akins v Glens Falls City School Dist.,* 53 NY2d 325, 333 [1981].)* At best, plaintiff's injury was a result of fatigue, the risk of which was assumed by plaintiff when he chose to play the sport of football. While experts testified that fatigue increases the likelihood of injury, a fact which would hardly seem controversial, there was no evidence that plaintiff's injury was a result of extraordinary fatigue. Indeed, plaintiff never demonstrated any causal link between his injury and his fatigued state. To the contrary, plaintiff claims, despite his alleged fatigue, to have performed properly and not to have contributed to his injury by employing improper blocking techniques.

Finally, it must be noted that while there is evidence that the coach and principal felt that GW would have been better placed in the B Division and that GW was thus mismatched against JFK, there is no evidence that such alleged "misplacement" or "mismatch" was causally connected to plaintiff's injury. Plaintiff's injury was an isolated occurrence in a closely played game. At the time of plaintiff's injury, just before the end of the first half, the score was 13 to 6, JFK had just scored and plaintiff, a star athlete, was injured while blocking a player of "marginal ability" on a kickoff return. Clearly, plaintiff's injury cannot be attributed to a "mismatch".

In sum, plaintiff has failed to "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant[s] was a cause in fact of the result" (Prosser and Keeton, Torts § 41, at 269 [5th ed]).

Accordingly, the judgment of the Supreme Court, Bronx County (McGee, J.), entered June 10, 1986, should be modified to the extent of dismissing plaintiff's remaining causes of action.