GALLAGHER et al., Appellees,

v.

CLEVELAND BROWNS FOOTBALL COMPANY, INC. et al., Appellants.

[Cite as *Gallagher v. Cleveland Browns Football Co.* (1994), 93 Ohio App.3d 449.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 63311.

Decided March 21, 1994.

**450**

*Nurenberg Plevin, Heller & McCarthy Co., L.P.A., Maurice L. Heller* and *Joel Levin,* for appellees.

*Isaac, Brant, Ledman & Becker, Donald L. Anspaugh* and *David E. Ballard; Kitchen, Deery & Barnhouse* and *Eugene B. Meader,* for appellants.

PATRICIA A. BLACKMON, Judge.

This appeal requests this court to hold that it is error for a trial court not to apply the doctrine of primary assumption of risk when a sideline spectator-videographer is injured by two football players who collide into him while he is kneeling and taping the last play of the first half of the game at the end zone known as the "Dawg Pound."

The Cleveland Browns Football Company, Inc., Cleveland Browns, Inc., and Cleveland Stadium Corporation, Inc., defendants-appellants, timely appeal the judgment of the Cuyahoga County Court of Common Pleas denying their motion for a judgment notwithstanding the verdict. They challenge the verdicts in favor of Michael Gallagher and Northbrook Property and Casualty Insurance Company, plaintiffs-appellees, and assign the following error for our review:

"The trial court erred in denying appellants' motion for judgment notwithstanding the verdict, because the evidence demonstrates that primary assumption of the risk precludes any duty to protect Michael Gallagher from being [sic] [,] given the circumstances of this particular professional football game."

Having reviewed the record and the legal arguments presented by both parties, we find the sole assignment of error is well taken, and we reverse the decision of the trial court. The apposite facts follow.

On December 18, 1988, Michael Gallagher received substantial injuries when he was collided into by two players during the Cleveland Browns–Houston Oilers game at the Cleveland Stadium. Gallagher was videotaping the game for his station, WJET–TV, an ABC affiliate in Erie, Pennsylvania. The players were proceeding for the ball at the "Dawg Pound" end of the field when the collision occurred. Before the collision, Gallagher had positioned himself at the end of the field near the outside corner of the "Dawg Pound" end zone.

Gallagher was not a stranger to the Cleveland Stadium and was aware of the rules of both the Cleveland Browns and the National Football League.

The NFL designated that a six-foot-wide solid white perimeter would identify and surround the field of play. Another six feet outside the white border was an outside perimeter designated by a yellow hash-marked line known as the "media line." The general rule required that media personnel stay outside the yellow hash-marked line. The Cleveland Browns also established the "kneeling rule." This rule required all media personnel to kneel when in the area between the thirty-yard line to the end zone on either end of the field of play. Media people's passes were subject to revocation if they failed to comply with these rules.

In Cleveland Stadium there is the area known as the "Dawg Pound." The "Dawg Pound" is unique in that the area between the white border of the end

zone and the yellow hash-mark line is mostly on an incline and closer to the fans. Beyond the incline, there is very little space between the yellow line and the fence that separates the fans from the field. It is virtually impossible for the media people to film from behind the media line at this end of the field, which is why some of the media are allowed to stand inside the media line. It is a dangerous end of the field.

It was not unusual for Gallagher or any of the media people to continuously move up and down the field with their camera equipment jockeying for the best position for the best footage of the game. This coverage benefited the Browns, and the Browns encouraged the media's presence because it increased its exposure and publicity. Since 1985, Gallagher had videotaped numerous games and was familiar with the Cleveland Browns and the playing field.

On the date in question, it was a cold and windy day and had snowed the previous night. The field of play was cleared, but snow from the night before remained on the area beyond the white border of the field and obscured the yellow hash-marked media line at the "Dawg Pound" end of the field.

The progress of the game was headed toward the "Dawg Pound" end of the field in the closing minutes of the first half of play. Media people covered the sidelines at that end of the field and Gallagher could not get a good sideline position. So Gallagher took a position at the end of the field near the outside corner of the end zone. When Gallagher took this position, he thought he was behind the media line. On inspection of the photographs, it is shown that he was not behind the media line. Gallagher originally took this position standing, but was almost immediately ordered to kneel by one of the security personnel. He complied with the order, but did not know whether the security person who told him to kneel was employed by the Cleveland Browns or Andy Frain, who was hired to assist with security. Gallagher knelt on two knees because it was the best position for balance. His camera weighed twenty-five pounds and was connected by a wire looped through his belt to a tape deck which weighed fifteen pounds.

As the next play began, Gallagher was kneeling and looking through the camera lens. When the two football players advanced directly toward him, he attempted to get up as quickly as possible. The two players were attempting to catch the pass thrown down field. The players failed to catch the football and collided with Gallagher. As a result of the collision, Gallagher suffered serious injuries to his jaw, mouth, neck, knee, and back.

The collision was captured on videotape and reviewed by an expert videographer. He testified that requiring Gallagher to kneel so close to the field of play put Gallagher in an unreasonable position and that Gallagher did not get out of the way in time because he was trying to follow the ball. In his opinion,

Gallagher's inability to get out of the way was enhanced by being required to kneel; had he not been required to kneel, he would have been able to get out of the way in time.

Gallagher and his expert testified that it was inherently dangerous for a sports videographer to cover a professional football game. Covering football games was inherently dangerous because it was common for football players to run out of bounds during games and collide with media people who were kneeling or standing. The risk was greatest near the end zones because it was the players' ultimate destination.

This danger was compounded by the decreased depth perception of a videographer looking through his video camera lens. With a decreased depth perception, a videographer could not accurately judge the distance or rate of speed of a person running in his direction. The lack of depth perception decreases a videographer's ability to judge proximity of approaching football players and when to move to get out of the way. It was common knowledge that the closer a videographer placed himself to the field of play, the greater the inherent danger. Gallagher and his expert agreed that it was a hazard of the trade.

Nevertheless, the case was tried on the complaint of Gallagher and Northbrook. Gallagher sought damages for negligence and Northbrook, Gallagher's insurer, sought indemnification for medical expenses paid. A directed verdict was granted in favor of Andy Frain because Gallagher could not identify the security person who had ordered him to kneel. At the conclusion of the trial, the jury was instructed on negligence. A jury verdict was returned in favor of Gallagher in the amount of $800,000 and in favor of Northbrook in the amount of $106,000. The Cleveland Browns moved for a judgment notwithstanding the verdict. The motion was denied.

Before we review this appeal on the merits, this court will address two procedural issues raised from the bench.

■ The first issue raised from the bench is whether the motion for judgment notwithstanding the verdict filed by the Cleveland Browns Football Company, Inc. should inure to the benefit of the Cleveland Browns, Inc. and the Cleveland Stadium Corporation, Inc. The Supreme Court of Ohio adopted the general rule that:

"A reversal is binding on the parties to the suit, but does not inure to the benefit of parties who did not join in the appeal, unless their rights and liabilities and those of the parties appealing are so interwoven and dependent as to be inseparable." *Wigton v. Lavender* (1984), 9 Ohio St.3d 40, 42, 9 OBR 129, 131, 457 N.E.2d 1172, 1175, citing 5B Corpus Juris Secundum (1958) 516, Section 1952.

See, also, *State ex rel. LTV Steel Co. v. Gwin* (1992), 64 Ohio St.3d 245, 250–251, 594 N.E.2d 616, 620–622.

In this case, the record is replete with evidence that the rights and liabilities of the Cleveland Browns Football Company, Inc., the Cleveland Browns, Inc., and Cleveland Stadium Corporation, Inc. are inseparable. Gallagher's first amended complaint alleges the same theory of liability on these defendants and all three of them filed identical answers and were represented by the same trial counsel.

Nonetheless, the most compelling evidence is the trial court's treatment of these three defendants as one entity. Throughout its instruction to the jury, the trial court referred to only one defendant, the "Cleveland Browns." The instructions further provided that "For purposes of this lawsuit, the defendant, Cleveland Browns, was the owner occupant of the premises on December 18, 1988." The interrogatories propounded to the jury referred to only one defendant, the "Cleveland Browns." The general verdict forms also referred to only one defendant, the "Cleveland Browns," and yet the trial court entered judgment against the Cleveland Browns Football Company, Inc., the Cleveland Browns, Inc., and the Cleveland Stadium Corporation, Inc.

Because it is clear that the trial court actually merged the three defendants at trial, the only conclusion that this court can reach is that the rights and liabilities of the defendants were inseparable. Accordingly, our disposition of the motion for judgment notwithstanding the verdict of Cleveland Browns Football Company, Inc. should inure to the benefit of the Cleveland Browns, Inc., and the Cleveland Stadium Corporation, Inc. See *Wigton, supra.*

The second issue raised from the bench is whether primary assumption of risk was waived as an affirmative defense under Civ.R. 8(C). Civ.R. 8(C) provides:

"(C) Affirmative defenses. In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, want of consideration for a negotiable instrument, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. * * * "

■ There can be no dispute that an affirmative defense is waived under Civ.R. 12(H), unless it is raised by motion before pleading under Civ.R. 12(B), affirmatively in a responsive pleading under Civ.R. 8(C), or by amendment under Civ.R. 15. *E.g., Mills v. Whitehouse Trucking Co.* (1974), 40 Ohio St.2d 55, 69 O.O.2d 350, 320 N.E.2d 668. See, also, *Cooper v. Grace Baptist Church of Columbus, Ohio, Inc.* (1992), 81 Ohio App.3d 728, 612 N.E.2d 357. Because this case involves whether assumption of risk was affirmatively pled under Civ.R.

8(C), we must also be mindful of its requirements. Under Civ.R. 8(E)(1), "[e]ach averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required."

In this case, the Cleveland Browns Football Company, Inc., the Cleveland Browns, Inc., and the Cleveland Stadium Corporation, Inc. filed identical answers to Gallagher's first amended complaint. In each answer, under the heading of *"AFFIRMATIVE DEFENSES,"* Paragraph 16 provides that "Defendant says that plaintiff Michael Gallagher assumed any risk of injury." Thus, the defendants asserted the affirmative defense of assumption of risk in "simple, concise, and direct" language. See Civ.R. 8(E)(1). Accordingly, assumption of risk was properly raised in compliance with Civ.R. 8(C).

The fact that primary assumption of risk was not raised, in a motion for directed verdict or to the jury at any time during trial, is of no consequence. A motion for judgment notwithstanding the verdict may be made "[w]hether or not a motion to direct a verdict has been made * * *." Civ.R. 50(B). Furthermore, primary assumption of risk need not be raised to a jury because it is an absolute bar to recovery to an action for negligence on the grounds that there is no duty of care. *Anderson v. Ceccardi* (1983), 6 Ohio St.3d 110, 6 OBR 170, 451 N.E.2d 780. Thus, it involves a question of law, not of fact, and as such it is properly decided by the trial judge under Civ.R. 50. See *Cooper,* 81 Ohio App.3d at 734, 612 N.E.2d at 360–361. We, therefore, hold that primary assumption of risk was properly pled under Civ.R. 8(C), and placed at issue for purposes of a motion for judgment notwithstanding the verdict under Civ.R. 50(B).

A reviewing court's concern on a Civ.R. 50(B) motion is the same as the trial court's, and it is the reviewing court's duty to determine if the trial court erred.

"Pursuant to Civ.R. 50(B), where there has been a verdict for plaintiff, the test to be employed by the trial court in determining whether to sustain a motion for judgment notwithstanding the verdict is whether the defendant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the plaintiff. When so construed, it is clear that the verdict is a reasonable one which the jury could reach from the evidence." *Cataland v. Cahill* (1984), 13 Ohio App.3d 113, 114, 13 OBR 131, 132, 468 N.E.2d 388, 390. See, *e.g., Osler v. Lorain* (1986), 28 Ohio St.3d 345, 28 OBR 410, 504 N.E.2d 19.

In this case, it is this court's opinion that the trial court erred in not applying the doctrine of primary assumption of risk.

Primary assumption of risk bars recovery by a plaintiff for injuries sustained during a sporting event when the plaintiff is a willing participant or a

spectator. *Collier v. Northland Swim Club* (1987), 35 Ohio App.3d 35, 518 N.E.2d 1226. Because primary assumption of risk negates the existence of a cause of action for negligence under the "no duty" theory, there is no issue for the jury concerning the cause of injury. *Anderson,* 6 Ohio St.3d at 114, 6 OBR at 174, 451 N.E.2d at 390.

In sports injury cases when there has been a finding of "no duty" or a finding of substantially diminished duty, the courts have specifically concluded that the injury is a foreseeable and customary part of the sport, therefore, defining the concept of implied assumption of risk and finding no liability. *Hanson v. Kynast* (1987), 38 Ohio App.3d 58, 526 N.E.2d 327. As a result, there is no issue for the jury to decide.

A jury question does exist concerning the cause of injury in the implied assumption of risk cases. *Anderson,* 6 Ohio St.3d at 113, 6 OBR at 173–174, 451 N.E.2d at 789. "Implied assumption of risk" is merely a term used to distinguish that category of assumption of risk which merged with contributory negligence from primary assumption of risk. *Mima v. Akron* (1986), 31 Ohio App.3d 124, 31 OBR 211, 508 N.E.2d 974. Implied assumption of risk and contributory negligence overlap for purposes of comparative fault where there is a duty of care owed. *Anderson,* 6 Ohio St.3d at 112–113, 6 OBR at 172–174, 451 N.E.2d at 389. The Supreme Court recognized the need for a jury question when assumption of risk and contributory negligence overlap in the comparative negligence area because to do otherwise would result in a weakened comparative fault statute. *Anderson, op. cit.*

This merger or overlapping notation does not apply to primary assumption of risk cases, because under primary assumption there is no duty of care. In *Anderson,* the court held that the doctrine of primary assumption of risk did not merge for purposes of comparative negligence. *Id.,* 6 Ohio St.3d at 114, 6 OBR at 174, 451 N.E.2d at 390. It went further to state that primary assumption of the risk "concerns cases where there is a lack of duty owed by the defendant to the plaintiff. This type of assumption of risk is typified by the baseball cases where a plaintiff is injured when a baseball is hit into the stands." *Id.,* citing *Cincinnati Base Ball Club Co. v. Eno* (1925), 112 Ohio St. 175, 147 N.E. 86. See, also, *Ivory v. Cincinnati Baseball Club Co.* (1939), 62 Ohio App. 514, 15 O.O. 357, 24 N.E.2d 837 (reversed trial court and entered directed verdict in favor of defendant under assumption of risk theory).

In *Eno,* 112 Ohio St. at 180–181, 147 N.E. at 87, the Supreme Court of Ohio provided the following analysis of cases involving baseball:

"The consensus of the above opinions is to the effect that it is common knowledge that in baseball games hard balls are thrown and batted with great

swiftness, that they are liable to be thrown or batted outside the lines of the diamond, and that spectators in positions which may be reached by such balls assume the risk thereof. This theory is fortified by the fact that such spectators can watch the ball and can thus usually avoid being struck when a ball is directed toward them.

"It is the general rule, also, so far as screening the grand stand is concerned, that due care on the part of the management does not require all of the spectators to be screened in; that the management performs its duty toward the spectators when it provides screened seats in the grand stand and gives spectators the opportunity of occupying them. The record shows that in the instant case the management had performed this duty."

The court in *Eno* held that the management had satisfied its duty with respect to the actual playing of the baseball game, but distinguished the duty of the management during intermission of the game. *Id.*, 112 Ohio St. at 181, 147 N.E. at 87–88. The court provided that because the spectator was an invitee, the management had a "duty to exercise ordinary care not to invite her into danger, and to that end it was its duty to exercise ordinary care to render the premises reasonably safe * * *." *Id.*, 112 Ohio St. at 182, 147 N.E. at 88. Thus, application of primary assumption of risk to sports events requires that the danger involved is ordinary to the game, it is common knowledge that the danger exists, and the resulting injury occurs as a result of the danger during the course of the game.

This concept of primary assumption of risk applies to both sports participants and sports spectators. The risk does not change so long as it is a foreseeable, customary part of the sport. Here, Gallagher's assumption of risk is similar to that of the spectator at a baseball game. At baseball games, due care does not require all of the spectators to be "screened in"; the management performs its duty when it provides some "screened in" seats and gives spectators the choice to occupy them. *Eno*, 112 Ohio St. at 181, 147 N.E. at 87. In the same respect, media people who are issued passes by professional football teams are free to roam the sidelines of the field with few restrictions. Where they stop and set up their cameras is a matter of choice.

In applying these juridical percepts to the facts of the case, we conclude that a spectator-videographer, whether kneeling or standing, accepts the fact that there is a chance of contact with a player. The risk of a collision is ordinary to the game of football because players advance for the ball and when advancing they collide with spectators and participants, which is the nature of the sport. The danger is known to all, especially those who roam the sidelines every game

day jockeying for a good position to tape the game. Gallagher's injury occurred when he was capturing the last play of the first half of the game.

The record reveals that the nature of professional football and the role of videographer were inherently dangerous. It was common knowledge and Gallagher was aware that football players often run out of bounds during games and collide with media people. This risk was greatest near the end zones, and was compounded by the decreased depth perception of the videographer.

The custom and practice at Cleveland Municipal Stadium was to allow media people inside the media line at the "Dawg Pound" end of the field, but to require that they kneel. The kneeling rule was commonly enforced by the Cleveland Browns and many of the other teams in the NFL.

The timorous videographer need not station himself any place inside the thirty-yard line on either side of the field, since in that area he is required to kneel and it is in that area he is most likely to be hit. It is his choice. Once he has accepted the risk of positioning himself in this area, kneeling or standing, he accepts the chance of contact with the players. It is known that running out of bounds and colliding with players and sideline spectators are events that are foreseeable, customary parts of the sport of football.

Gallagher argues, however, that the kneeling rule is unnecessary to the sport and its enforcement diminished his chances of escaping a collision. Subsumed in Gallagher's argument is the position that the enforcement of the kneeling rule creates the duty and the breach thereof if injury occurs. The appellants argue that they enforce the rule to avoid obstruction of the play for those spectators who are closest to the field of play. Regardless of the respective arguments, the fact remains that there is no duty of care owed by the Cleveland Browns to media people to ensure their safety when they venture into the known danger during the foreseeable customary events of the game. Football videography is inherently dangerous and neither the rules, regulations, customs, nor practices demonstrate that the Cleveland Browns owed Gallagher a duty of care to refrain from enforcing the kneeling rule. While we are mindful that media people jockey for the best position to capture the game on film, professional football stadium managers have no duty to guarantee the best footage of the game.

Gallagher argues that the enhancement of risk doctrine applies to this case and recovery is not barred. Citing *Kozera v. Hamburg* (1972), 40 A.D.2d 934, 337 N.Y.S.2d 761, and *Ingersoll v. Onondaga Hockey Club, Inc.* (1935), 245 A.D. 137, 281 N.Y.S. 505. In *Eno*, the Supreme Court of Ohio held that a spectator assumed the ordinary risks of attending a baseball game, where he or she chooses a seat that was not in a screened area and was struck by a baseball during the course of the game. See *Eno*, 112 Ohio St. at 180, 147 N.E. at 87. In *Kozera*, the father of a Little League player assumed the risk of being hit by a

foul ball during the baseball game, because he chose to sit on the players bench outside third base instead of in the screened area behind home plate. In *Ingersoll*, a hockey spectator assumed the risk of being hit by a puck, when she sat in an unprotected section of the rink. Thus, the notion of enhanced risk according to Gallagher seems to employ an analysis consistent with Ohio law; a spectator assumes the risk of injury where he places himself in peril and the injury is incident to the game.

Gallagher relies on *Jones v. Three Rivers Mgt. Corp.* (1978), 483 Pa. 75, 394 A.2d 546 (held spectator hit in the eye by baseball during batting practice while properly using interior walkway of the stadium not a common, frequent, and expected risk of attending a baseball game). In *Jones*, the court held that the "no-duty" rules apply only to risks which are "common, frequent, and expected." *Id.* at paragraph four of the syllabus. The "no duty" rule in Jones is no different from the primary assumption of risk doctrine in Ohio law. The risk to Gallagher occurred during a sporting event while players were running for a football that had been thrown to the players.

Nevertheless, Gallagher asks that this court adopt the special and unusual ruling of *Benitez v. New York City Bd. of Edn.* (1988), 141 A.D.2d 457, 530 N.Y.S.2d 825. In that case, a high school student was injured while playing ball. The school had a duty to supervise; instead of adhering to that duty, it enhanced the student's risk by playing him in a game where he was "mismatched" and "fatigued." The school is held to have breached its duty to supervise when for its own selfish needs it continued to play a student under these conditions. The student cannot be held to have accepted the risk. The court held that these were highly unusual facts and the assumption of the risk defense would have left this young man without legal recourse. The court was concerned about the uneven playing field of teacher-adviser-coach and student-player. The duty to supervise was at the core of the risk-factor.

We, therefore, conclude that it is inappropriate to apply this doctrine to this case. The risk to Gallagher was neither unusual nor out of the ordinary. Furthermore, this doctrine seems to exist when there is a breach of an existing duty. It has been held that primary assumption of risk does not apply when there is evidence that the defendant breached an existing duty that creates a risk not ordinarily incident to a dangerous sport. *Moss v. Ohio Assn. of United States of Am./Amateur Boxing Fedn., Inc.* (Apr. 2, 1987), Clark App. No. 2266, unreported, at 3, 1987 WL 9122. See, also, *Roeckner v. Pence Drag Strip, Inc.* (1965), 10 Ohio App.2d 20, 39 O.O.2d 61, 225 N.E.2d 284, (held: race driver under no duty to anticipate abnormal track conditions or foreign obstacles at or near the berm of the track). The court in *Moss* recognized that the Amateur Boxing

Federation had a duty to follow its own rules and regulations notwithstanding the inherent danger in the sport of boxing. *Id.*

Consequently, enhancement of risk is appropriate where there is an existing duty or where there is no existing duty but a duty created because the risk is not inherent to the sport. In this case, there is no existing duty and no duty created by the kneeling rule. The risk to Gallagher was a foreseeable, customary part of the game of football, since it was known that sideline spectators, videographers, players, or sideline guests, whether standing or kneeling, regardless of location on the field were at risk of a collision with players advancing for the ball. Yet, if a sideline spectator ventures into that area of the field between the thirty-yard line and the end zone, he is required to kneel and the appellants are under no duty to ensure his safety. It is his choice.

Gallagher argues in a cross-assignment that primary assumption of risk does not apply, because he was compelled to encounter risk in the course of his employment. Gallagher erroneously relies on *Cremeans v. Willmar Henderson Mfg. Co.* (1991), 57 Ohio St.3d 145, 566 N.E.2d 1203, which held that an employee does not voluntarily assume the risk of injury in the course of his employment.

The employment relationship exists only when one party exercises the right of control over the actions of another and those actions are directed toward the attainment of an objective which the former seeks. See *Hanson v. Kynast* (1986), 24 Ohio St.3d 171, 24 OBR 403, 494 N.E.2d 1091, at paragraph one of the syllabus (held: university did not have principal-agent or master-servant relationships with a student on the university's lacrosse team). The Supreme Court of Ohio reasoned that an agency relationship cannot be based upon the mere fact that the university derived a benefit through the publicity generated by a lacrosse team. *Id.* at 176, 24 OBR at 407, 494 N.E.2d at 1095–1096.

In this case, Gallagher was not an employee of the Cleveland Stadium Corporation or the Cleveland Browns. This court is not persuaded that the mere fact that Gallagher was issued a media pass and was taking video footage that would publicize the Cleveland Browns formed a master-servant relationship. See *Hanson*, 24 Ohio St.3d 171, 24 OBR 403, 494 N.E.2d 1091. The only potential employment relationship in this case was between Gallagher and WJET–TV. Therefore, the *Cremeans* analysis does not apply.

Gallagher also argues in a cross-assignment that primary assumption of risk does not apply, because the Cleveland Browns' conduct was willful and wanton conduct in reckless disregard of Gallagher's safety. In order for an act to be reckless, the risk involved must itself be an unreasonable one under the circumstances. See *Thompson v. McNeil* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705.

"What constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the particular game is played, *i.e.*, the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game.

"If the rules of a sport allow conduct intended to harm another player, as they do in boxing or football, for example, it follows that those same rules also allow behavior that would otherwise give rise to liability for recklessness. But any conduct which is characterized by the strong probability of harm that recklessness entails, and which occurs outside the normal conduct and customs of the sport, may give rise to liability." *Id.* at 105, 559 N.E.2d at 708.

In the context of a videographer at a professional football game, we find that the risk incurred by Gallagher was a reasonable risk; the conduct of the Cleveland Browns was consistent with the customs of professional football and the regulations governing videographers at football games. Consequently, enforcement of the kneeling rule was not willful and wanton conduct.

In the beginning of this opinion, we outlined the issues as they appeared to us; we concluded without reservation that the doctrine of primary assumption of the risk applies and bars recovery. Although we were free of reservation, we were not cavalier, nor did we fail to appreciate the gravity of Gallagher's injuries. Yet, our jurisprudential history teaches us that not all injuries are compensable regardless of the endless reach of some tortfeasor's pockets or the substantial gravity of some tort sufferer's injuries. The bright lines of these cases are not deemed or darkened because of either variable, but brighter, focused, and unblurred because of the juridical nature of the doctrine of primary assumption of risk. Construing the evidence most strongly in favor of Gallagher as the plaintiff, we hold that the Cleveland Browns Football Company, Inc., Cleveland Browns, Inc. and the Cleveland Stadium Corporation, Inc. are entitled to judgment as a matter of law. Accordingly, we hold that the trial court erred in denying the defendants judgment notwithstanding the verdict.

*Judgment reversed.*

HARPER, J., concurs.

NUGENT, J., dissents.

DONALD C. NUGENT, Judge, dissenting.

Because I believe the defendants-appellants, Cleveland Browns Football Company, Inc., Cleveland Browns, Inc. and Cleveland Stadium Corporation, Inc., have waived their right to assert the defense of primary assumption of risk, I respectfully dissent from the majority's decision to reverse the jury verdict

finding in favor of plaintiffs-appellees, Michael Gallagher and Northbrook Property and Casualty Insurance Co.

Under the unique procedural circumstances presented by the case *sub judice,* I conclude that the appellants waived their right to assert the defense of primary assumption of risk by failing to raise the defense prior to or during trial. The record reveals that the defense of primary assumption of risk was not raised until defendant-appellant Cleveland Browns Football Company, Inc. filed its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

It is well established that a party may waive an affirmative defense if not brought to the trial court's attention. Civ.R. 8(C); and, see, *Mills v. Whitehouse Trucking Co.* (1974), 40 Ohio St.2d 55, 69 O.O.2d 350, 320 N.E.2d 668; *Hoover v. Sumlin* (1984), 12 Ohio St.3d 1, 12 OBR 1, 465 N.E.2d 377. However, a party may raise as an affirmative defense issues which were not raised in the pleadings by implied amendment when an amendment would conform to the evidence and when an issue has been tried by either the express or implied consent of the parties. Civ.R. 15(B); see, also, *Hoover, supra; State ex rel. Evans v. Bainbridge Twp. Trustees* (1983), 5 Ohio St.3d 41, 5 OBR 99, 448 N.E.2d 1159; *Mason v. Swartz* (1991), 76 Ohio App.3d 43, 600 N.E.2d 1121; and *Goldfarb v. The Robb Report, Inc.* (1991), 77 Ohio App.3d 362, 602 N.E.2d 329. In the present case, the record reveals that while appellants pleaded the affirmative defense of assumption of risk in their separate answers, appellants failed to expressly raise the defense of primary assumption of risk at any time prior to the motion for judgment notwithstanding the verdict filed by defendant-appellant Cleveland Browns Football Company, Inc.

In the recent case of *Cooper v. Grace Baptist Church of Columbus, Ohio, Inc.* (1992), 81 Ohio App.3d 728, 612 N.E.2d 357, the Franklin County Court of Appeals held that it was reversible error to permit defendants to raise for the first time the affirmative defense of privilege on a motion for directed verdict, made after the plaintiffs' case-in-chief when it had not been raised in defendants' answer or when the issue was never developed during the course of proceedings. The court reached its conclusion while being mindful of Civ.R. 15(B), which permits liberal amendments to pleadings when an amendment would "conform to the evidence" and when the issue has been tried by either the " '*express* or *implied consent of the parties.*' " (Emphasis added.) *Id.* at 735, 612 N.E.2d at 361, quoting *State ex rel. Evans, supra.*

In the instant case, the following relevant facts must be considered:

1. While each appellant raised the affirmative defense of assumption of the risk in its original and amended answers, the defense of primary assumption of risk was not raised until appellant Cleveland Browns Football Company, Inc. filed its motion for judgment notwithstanding the verdict. In their separate answers,

each appellant stated, "defendant says that plaintiff Michael Gallagher assumed any risk of injury." This exact language was used in each answer and/or amended answer that was filed on behalf of the appellants.

2. The appellants did not raise the affirmative defense of primary assumption of the risk in their joint trial brief that was filed approximately two weeks prior to the trial's commencement. In fact, appellants contended "that if they were negligent, then plaintiff Michael Gallagher was comparatively negligent * * *." (Trial brief, at 2.) Likewise, none of the proposed jury instructions submitted with the trial brief requested an instruction on primary assumption of the risk.[1]

3. At the close of all the evidence, the appellants jointly moved for a directed verdict. The basis for this motion was their assertion that Gallagher's status as an invitee had changed to that of a licensee by virtue of the fact that Gallagher had placed himself inside the yellow hash line. Focusing on plaintiff's behavior rather than a lack of duty owed by themselves (which is the hallmark of primary assumption of the risk), appellants contended that plaintiff's change in status to that of a licensee rendered them free of any duty to plaintiff other than acting in a willful and/or wanton manner. Again, appellants failed to raise the affirmative defense of primary assumption of the risk.

4. While appellants did try to establish that Gallagher knew of all the attendant risks involved with videophotographing a professional football game, including the increased risk of performing this task in a kneeling position close to the field of play, this again is not the premise upon which to establish a case of primary assumption of the risk. This was succinctly stated in *Mima v. Akron* (1986), 31 Ohio App.3d 124, 125, 31 OBR 211, 211–212, 508 N.E.2d 974, 975–976, where that court held that primary assumption of the risk is an alternative expression for the concept that a defendant either owed no duty to a plaintiff or did not breach a duty owed. As such, the defense is not related to the plaintiff's conduct, nor is it merged with the defense of contributory negligence. See, also, *Jaworowski v. Med. Radiation Consultants* (1991), 71 Ohio App.3d 320, 335, 594 N.E.2d 9, 19 ("A necessary predicate to an instruction on primary assumption of risk is the existence of some fact that suggests the defendant owed no duty or breached no duty owed."). Instead, appellants framed their argument upon plaintiff's behavior and the alleged resultant change of his status (from invitee to licensee) as a basis for their contention that they no longer owed the duty of care which is required by the superior (invitee) status. Only after trial, when their change-of-status argument had failed, did defendant Cleveland Browns Football

---

1. While not dispositive, it is noteworthy that defendant Andy Frain Services did include in its trial brief an instruction on primary assumption of the risk based upon *Siglow v. Smart* (1987), 43 Ohio App.3d 55, 58, 539 N.E.2d 636, 639–640. It also argued this defense in its trial brief.

Company, Inc. assert the defense of primary assumption of the risk based upon the premise of no duty owed to plaintiff.

5.  During closing arguments, counsel for appellants urged the jury to listen to, and then read carefully, the definitions of "invitee," "licensee" and "trespasser" and the duty that an individual owes to each. Again, appellants focused on the behavior of plaintiff rather than on the duty owed by the defendants. Additionally, defense counsel urged the jury to "listen and read carefully the instructions with regard to assumption of the risk instruction, comparative negligence * * *." When taken in this context, and coupled with the jury instructions on comparative negligence, the only conclusion that can be reached is that defense counsel was referring to implied or secondary assumption of the risk when he referred to "assumption of the risk instructions."

6.  Subsequently, the trial judge read and explained the jury instructions that included definitions of "invitee," "licensee" and "trespasser," along with the duties owed to each, and instructions on negligence and the affirmative defense of comparative negligence, including the principles of apportionment of liability. The trial judge also explained the interrogatories that the jury would be given and how to proceed with each, depending upon their particular findings. After instructing the jury on these particular areas of law, as well as several other areas not particularly relevant here, she then gave counsel for both sides an opportunity to formally state their objections. Defense counsel offered no objections, but merely stated, "Your Honor, I have none. Thank you." Once more, defendants' opportunity to advocate the defense of primary assumption of the risk was not utilized.

7.  Finally, the jury, in returning its unanimous decision, found that appellants were negligent and that their negligence was a proximate cause of plaintiff's injuries. Likewise, the jury also found that plaintiff Gallagher, either by his own negligence or by his implied assumption of risk, contributed to his injury and, on a comparative basis, was thirty-five percent at fault. As can be seen from the foregoing, defense counsel made no effort to assert the affirmative defense of primary assumption of risk. Instead, counsel focused on the appellee's conduct and relied on the defense of implied or secondary assumption of the risk. Consequently, appellants waived their right to assert the defense of primary assumption of risk by not raising this defense in their pleadings or by amendment to the pleadings to conform to the evidence.

It is further noteworthy that appellants' failure to assert the defense of primary assumption of risk may not have been by accident. As previously stated, a party may waive an affirmative defense. Civ.R. 8(C); *Mills, Hoover,* and *Cooper, supra.* Moreover, the decision to waive an affirmative defense may well be a sound tactical decision. In the present cause, the record reveals that

appellants' counsel pursued the defense of implied assumption of risk and comparative fault. The potential benefits of such defense are obvious when compared to the risks of pursuing the defense of primary assumption of risk.

First, the jury could have found in appellants' favor by concluding that appellants were not negligent or that appellants' negligence, if any, did not proximately cause plaintiff's injuries. In fact, defense counsel did take this approach with the jury by arguing that when plaintiff crossed over the yellow media line, he ceased being a business invitee and became a licensee or, worse, a trespasser. In such case, plaintiff would be required to show that appellants' conduct was reckless. However, as defense counsel was quick to point out, plaintiff did not plead any allegations of willful, wanton or reckless conduct. In such case, plaintiff would not, therefore, be entitled to any recovery.

Second, the jury could have found that appellants were negligent and that such negligence was a proximate cause of plaintiff's injuries, but that plaintiff's negligence was greater than the combined negligence of the appellants. Again, in such case, plaintiff would not be entitled to any recovery. Alternatively, the jury could have apportioned fault in favor of plaintiff, but, nonetheless, appellants' overall liability could be reduced accordingly. This is, in fact, what happened.

Finally, and least likely, the jury could have concluded that appellants' negligence was the sole, proximate cause of plaintiff's injuries. In such case, appellants would be fully liable for plaintiff's injuries. Thus, the decision to pursue an implied assumption of risk/comparative negligence defense in the case at bar provided appellants with the opportunity to argue that they have no liability for plaintiff's injuries or that their liability should be reduced by plaintiff's comparative fault. Moreover, the least likely scenario would result in a jury's finding appellants fully liable for plaintiff's injuries. As will be seen, however, the risks of pursuing a primary assumption of risk defense could present an "all or nothing" decision for the jury concerning appellants' liability for plaintiff's injuries.

As previously mentioned, raising the defense of primary assumption of risk is not without some peril. Had defense counsel raised such defense in the pleadings, plaintiff's counsel may have sought leave of court to amend his complaint to plead willful, wanton or reckless misconduct on the part of appellants. In fact, plaintiff Gallagher was forced to argue that appellants' kneeling policy amounted to willful, wanton or reckless misconduct in his brief in opposition to the motion for judgment notwithstanding the verdict filed by appellant Cleveland Browns Football Company, Inc. and in his appellee's brief before this court. This was done, however, without the opportunity for plaintiff to fully develop this issue at trial and before the jury, which is most eminently suited to judge appellants' conduct.

It is well settled that leave of court is to be fully given when justice requires. Civ.R. 15(B); *State ex rel. Evans, supra.* Moreover, primary assumption of risk is not a defense to tortious conduct which is willful, wanton or reckless. *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 559 N.E.2d 699; *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705. More importantly, the difference between negligent conduct and willful or reckless conduct is a matter of degree. See 2 Restatement of the Law 2d, Torts (1965), Section 500,[2] and 1 Restatement of the Law 2d, Torts (1965), Section 8A. Thus, had the defense of primary assumption of risk been raised in the pleadings or at trial, and had plaintiff Gallagher amended his pleadings to allege willful, wanton or reckless misconduct on the part of appellants (as is likely), appellants would be exposed to an "all or nothing" risk of liability for plaintiff Gallagher's injuries, since primary assumption of risk is not a defense to willful, wanton or reckless misconduct. Moreover, appellants would potentially be exposed to punitive damages should their conduct be considered willful or wanton. See R.C. 2315.21; *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 543 N.E.2d 464; *Vebelacker v. Cincom Systems, Inc.* (1992), 80 Ohio App.3d 97, 608 N.E.2d 858.

At trial, the main "bone of contention" between the parties was the issue of whether the kneeling rule that was enforced in this particular area of Cleveland Stadium was necessary. Evidence adduced at trial revealed that the Dawg Pound is significantly elevated above the playing field and that the Browns' personnel have no record or recollection of a history of complaints by Dawg Pound fans that their view was obstructed by cameramen standing behind the end zone. In addition, plaintiff Gallagher testified at trial that "there are always photographers on the white line in the end zone, and by being here so many years, I assumed that was the normal procedure." Likewise, trial testimony also revealed that if a cameraman were standing behind the yellow hash lines (*i.e.*, on top of the incline), he would be blocking the view of fans located in the Dawg Pound. Furthermore, it would be virtually impossible to kneel in this area, as

---

**2.** *"Negligence and recklessness contrasted.* Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind." Comment *g*, Restatement of the Law 2d, Torts, Section 500, at 590.

the incline is too severe. Testimony also revealed that when a cameraman stands at the foot of the incline (*i.e.,* at the outside edge of the white border), the view from the Dawg Pound is not blocked, thus making the kneeling policy in that area unnecessary and, given the fact that that particular area (from the outer edge of the white border to the foot of the incline) is narrow and the incline directly behind was snow-covered, the kneeling policy was also fraught with danger. The issue at trial then became a question of whether the Browns were negligent in implementing the kneeling policy and whether appellee unreasonably assumed the risk. The jury answered both inquiries affirmatively, and liability was accordingly apportioned.

However, pursuant to the motion for judgment notwithstanding the verdict, the issue became a question of whether appellee knowingly and voluntarily assumed an ordinary, inherent risk that was part and parcel of his participation in the activity of filming a professional football game, with no attendant duty on the part of the Browns, other than to refrain from acting intentionally or recklessly. Thus, the doctrine of primary assumption of the risk would be applicable, and appellants would be relieved from any liability. On the other hand, it cannot be shown, *by way of motion,* that the Cleveland Browns' kneeling policy in this area of the field was reckless. Thus, appellants cannot lose by asserting primary assumption of risk *by way of motion,* since the issue of their recklessness was never raised at trial. Accordingly, I believe that the issue of whether plaintiff Gallagher assumed the risk is an issue of fact for the jury's determination. *Siglow v. Smart* (1987), 43 Ohio App.3d 55, 539 N.E.2d 636. Additionally, the issue of whether the Cleveland Browns' kneeling policy as it relates to this area of the playing field creates an inordinate risk, not inherent in Gallagher's usual and customary activities, is also a question of fact for the jury's determination. *Id.*

While the majority's opinion addresses the waiver issue, I believe its reliance on Civ.R. 8(C) is misplaced. I agree that a pleading, including an answer, shall be simple, concise and direct and that no technical forms of pleading are required. Nonetheless, a pleading should give the opposing party adequate notice of the nature of the action or defense. See *Conley v. Gibson* (1957), 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 101–102; *Salamon v. Taft Broadcasting Co.* (1984), 16 Ohio App.3d 336, 16 OBR 385, 475 N.E.2d 1292; and *DeVore v. Mutual of Omaha Ins. Co.* (1972), 32 Ohio App.2d 36, 61 O.O.2d 21, 288 N.E.2d 202. In the present case, appellants pleaded the defense of assumption of risk but chose to pursue the doctrine of implied assumption of risk as their defense at trial. The majority's opinion adequately sets forth the differences between primary and implied assumption of risk. These differences, as well as any strategic decisions on appellants' part to pursue one over the other, must be kept in mind when

determining whether the appellants adequately placed plaintiff Gallagher on notice of their defense. It is these differences and appellants' decision to pursue implied assumption of risk as a defense at trial that lead me to conclude that appellants waived the defense of primary assumption of risk.

The majority is also correct when it states that a motion for judgment notwithstanding the verdict may be made whether or not a motion to direct a verdict has been made. Nonetheless, an affirmative defense such as primary assumption of risk must be raised in a fashion sufficient to place the opposing party on notice, at the latest, at trial. Civ.R. 12(H)(2). The only exception is lack of subject matter jurisdiction. Civ.R. 12(H)(3). In the present case, appellants failed to raise at trial the defense of primary assumption of risk.

The majority concludes that appellants are entitled to judgment as a matter of law. However, for the reasons previously stated, I believe appellants have waived their right to assert the defense of primary assumption of risk. Moreover, even if the defense had not been waived, I conclude that, under the unique factual circumstances presented herein, the issue of whether the Cleveland Browns' kneeling policy was reckless is a question of fact for the jury's determination. See *Siglow, supra.* Thus, the defense of primary assumption of risk would not apply if the jury determined appellants' conduct to be reckless. Accordingly, I would overrule appellants' sole assignment of error and affirm the judgment of the common pleas court.