Filed 3/23/10 NO. 4-09-0490

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| WENDY PICKEL, | ) | Appeal from |
|       Plaintiff-Appellant, | ) | Circuit Court of |
|       v. | ) | Sangamon County |
| SPRINGFIELD STALLIONS, INC.; JUSTIN | ) | No. 08L98 |
| GETTYS, Individually and d/b/a STALLIONS | ) | |
| FOOTBALL CLUB; KRIS UNDERWOOD, | ) | |
| Individually and d/b/a STALLIONS FOOTBALL | ) | |
| CLUB; ACCIE CONNER, a/k/a D'LO BROWN; | ) | |
| and THE CONTINENTAL INDOOR FOOTBALL | ) | Honorable |
| LEAGUE, | ) | Leo J. Zappa, Jr. |
|       Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE APPLETON delivered the opinion of the court:

Plaintiff, Wendy Pickel, brought this action to recover compensation for personal injuries she allegedly suffered while watching an indoor football game, in which the Springfield Stallions were playing. According to her amended complaint, a football player ran out of bounds, fell over a wall separating the spectators from the playing field, and collided with her. She does not fault any of the football players. Rather, she alleges this accident happened because of various negligent acts or omissions by the five organizational and individual defendants, who, as partners, operated the Springfield Stallions and possessed the arena, namely, Springfield Stallions, Inc.; Justin Gettys; Kris Underwood; Accie Conner, also known as D'Lo Brown; and The Continental Indoor Football League.

Pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2008)), defendants moved to dismiss the first amended complaint with

prejudice because plaintiff had failed to plead that their conduct in causing her injuries was willful and wanton. Defendants argued that because football was a contact sport, in which violent collisions were inherent in the game, cases such as Karas v. Strevell, 227 Ill. 2d 440, 884 N.E.2d 122 (2008), and Pfister v. Shusta, 167 Ill. 2d 417, 657 N.E.2d 1013 (1995), required plaintiff to plead a greater culpability on their part than mere negligence. The trial court agreed with defendants' argument and granted their motion for dismissal of the amended complaint with prejudice. Plaintiff appeals, arguing that cases such as Karas and Pfister, in which the plaintiffs were participants in contact sports, are inapposite because she was only a spectator at the football game, not a participant.

We agree with plaintiff that her status as a spectator, rather than a participant, makes Karas, Pfister, and similar cases fundamentally distinguishable. According to the amended complaint, defendants were possessors of the Prairie Capital Convention Center (Convention Center) in Springfield, and they held the premises open to members of the public who paid a fee to watch the football game. Defendants' duty, therefore, was well established under the common law: a duty to take reasonable action to protect the invitees against an unreasonable risk of harm. Acting reasonably meant refraining from negligence. Hence, we reverse the trial court's judgment and remand this case for further proceedings.

I. BACKGROUND

In her amended complaint, plaintiff pleads as follows. Defendants were partners (or so plaintiff alleges on information and belief), and they operated a football team called the "Springfield Stallions." The Springfield Stallions played in the auditorium

of the Convention Center, which defendants "possessed" and "controlled" for that purpose. Defendants invited the public to attend these indoor football games and charged an admission fee, which defendants divided among themselves.

On April 14, 2007, plaintiff went to the Convention Center, paid the admission fee, and entered the auditorium to watch a football game, in which the Springfield Stallions were playing. She "was situated in an area designated by [defendants] for spectators to sit or stand [in] and view the football game." A wall, provided by defendants, separated plaintiff and other spectators from the playing field. The purpose of this wall, plaintiff alleges, was to protect spectators from being struck by football players during the game. Defendants "had a duty to exercise reasonable care for the safety of [p]laintiff in the maintenance of the wall and in the designation of areas in which [p]laintiff and other spectators could view the football game."

The amended complaint accuses defendants of various negligent acts or omissions with respect to the construction of this wall, the lack of warning, and the designation of areas for spectators. Essentially, these acts or omissions are reducible to three: (1) defendants encouraged plaintiff and other spectators to sit or stand in an area that was dangerously close to the playing field, (2) defendants failed to warn plaintiff and other spectators of the danger of being in this designated area, and (3) defendants failed to erect a wall that was high enough and sturdy enough to protect plaintiff and other spectators from being hit by football players during the game. As a result of these negligent acts or omissions, "a player unexpectedly fell over the *** wall from the playing field to the *** spectator area, thereby coming into sudden and violent contact with the [p]laintiff."

Because plaintiff alleged mere negligence on their part, defendants moved to dismiss the amended complaint, with prejudice, pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2008)). Using the rationale from Karas, defendants insisted that any standard of culpability less than willfulness and wantonness would "necessarily change the level of caution with which players approach[ed] the game and/or the attraction of the game to the spectator." Defendants explained that "having spectators close to the field in a reduced, more confined space[] [was] an essential part of the excitement of an arena football game" and that "moving fans farther away from the field of competition [would] take away [from] the very atmosphere of arena football, significantly changing the game." Defendants further pointed out that requiring football players to exercise "reasonable care" when approaching the sidelines would have a chilling effect on the game and would diminish the passion and vigor with which it was played. According to defendants, "[t]hese chilling and significant effects [were] precisely [the] changes the *** Supreme Court [of Illinois] sought to avoid in adopting the rule in Karas."

Plaintiff contended that defendants' reliance on Karas and similar cases was misplaced because she, a spectator rather than a participant in the game, predicated her claim on the negligence of defendants in placing her near the playing field, behind an inadequate barrier, not on anything the football players had done and not on any failure by defendants to supervise the players or enforce the rules of the game. She observed that in the cases in which Illinois courts excepted contact sports from claims of negligence, they barred participants, not spectators, from suing for negligence. Further, plaintiff objected that defendants' discussion of the essential features of arena football, such as placing the

spectators close to the playing field, was unsupported by any affidavits or other evidentiary materials.

It is impossible to tell, from the dismissal order, whether the trial court relied on any of defendants' representations regarding arena football, but the court accepted their argument that mere negligence on their part could not render them liable. The court remarked that, in Karas, the supreme court had "held that the contact sports exception to negligence[,] which provide[d] that participants in a contact sport [were] only liable for willful and wanton conduct[,] [was] applicable to organizational defendants." "[B]ased upon [that] exception," the court concluded that plaintiff was required to "plead that the organization and [d]efendants committed willful and wanton conduct, not mere negligence." Because plaintiff had pleaded only negligence, the court granted defendant's motion to dismiss the amended complaint with prejudice. The court subsequently denied plaintiff's motion for reconsideration, in which she again argued the inapplicability of Karas.

This appeal followed.

II. ANALYSIS

A. Standard of Review

A motion to dismiss a complaint pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2008)) challenges the legal sufficiency of the complaint on the basis of defects appearing on its face. Marshall v. Burger King Corp., 222 Ill. 2d 422, 429, 856 N.E.2d 1048, 1053 (2006). Because the trial court is in no better position than we to assess the legal sufficiency of a complaint on the basis of the allegations within its four corners,

we review the court's ruling <u>de</u> <u>novo</u>. <u>Marshall</u>, 222 Ill. 2d at 429, 856 N.E.2d at 1053.

In performing this review, we accept as true all well-pleaded facts in the complaint. <u>Marshall</u>, 222 Ill. 2d at 429, 856 N.E.2d at 1053. "Well-pleaded facts" is a term that stands in contrast to "conclusions." To the extent that the complaint offers conclusions unsupported by allegations of fact, we do not accept those conclusions as true. <u>Marshall</u>, 222 Ill. 2d at 429-30, 856 N.E.2d at 1053. Although the complaint need not itemize the evidence supporting the claim, it must allege facts sufficient to comprise a legally recognized cause of action, not bare conclusions. <u>Marshall</u>, 222 Ill. 2d at 429-30, 856 N.E.2d at 1053.

We view these well-pleaded facts in a light most favorable to the plaintiff. <u>Marshall</u>, 222 Ill. 2d at 429, 856 N.E.2d at 1053. That is to say, whenever it would be reasonably defensible to do so, we draw inferences favorable to the plaintiff from those facts. It follows that a court should not grant a motion for dismissal pursuant to section 2-615 unless it is clear, from the factual allegations and the reasonably permissible inferences therefrom, that no set of facts could be proved that would entitle the plaintiff to recovery under the law. <u>Marshall</u>, 222 Ill. 2d at 429, 856 N.E.2d at 1053.

### B. The Duty That Participants and Organizational Defendants Owe to Coparticipants in Full-Contact Sports

Plaintiff cites <u>Karas</u>, 227 Ill. 2d at 464, 884 N.E.2d at 137, for the following proposition: "In addition to direct participants in contact sports, organizational defendants are similarly liable only for injuries to participants caused by willful and wanton misconduct." Likewise, on the authority of <u>Pfister</u>, 167 Ill. 2d at 420, 657 N.E.2d at 1015, defendants inform us that "[u]nder th[e] judicially created exception [for contact sports],

voluntary participants in sports-related conduct are only liable for injuries caused by willful and wanton, or intentional misconduct, and are not liable for injuries caused by simple negligence."

These statements are true as far as they go, but in Karas, 227 Ill. 2d at 455, 884 N.E.2d at 132, the supreme court drew a distinction between "contact sports," such as the dormitory game of kick the can in Pfister, and "full-contact sports," such as ice hockey and tackle football. In the can-kicking in Pfister, some bodily contact was inevitable as the players scrambled for the can in an effort to kick it to the wall that represented the opposing team's goal, somewhat in the manner of soccer. Pfister, 167 Ill. 2d at 425, 657 N.E.2d at 1017. In ice hockey and tackle football, however, bodily contact is not merely an expected byproduct of the game; it is an objective. The players deliberately set out to engage in physical contact with their opponents, and subject them to the risk of physical injury, by tackling them, ramming them, or body checking them. In Karas, 227 Ill. 2d at 442, 884 N.E.2d at 124, the plaintiff was an ice-hockey player who allegedly sustained injuries when he was body checked from behind by two opposing players, and he alleged that this sort of bodily contact, or the toleration of it by officials, amounted to negligence and willful and wanton misconduct. All the ice-hockey players understood, however, that violent, stunning, bruising collisions were the way the game was played. Karas, 227 Ill. 2d at 456, 884 N.E.2d at 132-33. For that reason, in Karas, 227 Ill. 2d at 457, 884 N.E.2d at 133, the supreme court decided that the duty it had formulated in Pfister--the duty of a participant in contact sports to refrain from intentionally or willfully and wantonly injuring a co-participant (Pfister, 167 Ill. 2d at 427, 657 N.E.2d at 1018)--would be unfair to participants

in full-contact sports, such as ice hockey and tackle football. The duty would be unfair because "willful and wanton conduct" is, by definition, "'a course of action which shows actual or deliberate intent to harm or which, if the course of action is not intentional, shows an utter indifference to or conscious disregard for a person's own safety or the safety or property of others'" (Karas, 227 Ill. 2d at 455, 884 N.E.2d at 132, quoting Pfister, 167 Ill. 2d at 421, 657 N.E.2d at 1016), and in full-contact sports, a conscious disregard for the safety of the opposing player is inherent in the game, as all the participants fully understand before they skate into the rink or set foot on the field. Karas, 227 Ill. 2d at 456, 884 N.E.2d at 132. You cannot knock someone off his feet, or bounce him off a wall, while having a regard for his safety.

Consequently, instead of the duty to refrain from willful and wanton or intentional misconduct--a duty that Pfister imposed on participants in contact sports--the supreme court imposed the following duty on participants in full-contact sports: "[I]n a full[-]contact sport such as ice hockey or tackle football, a participant breaches a duty of care to a coparticipant only if the participant intentionally injures the coparticipant or engages in conduct 'totally outside the range of the ordinary activity involved in the sport.'" Karas, 227 Ill. 2d at 459, 884 N.E.2d at 134, quoting Knight v. Jewett, 3 Cal. 4th 296, 320-21, 11 Cal. Rptr. 2d 2, 18, 834 P.2d 696, 712 (1992). Thus, in contrast to participants in contact sports, participants in full-contact sports owe coparticipants a duty to refrain from intentionally injuring them or engaging in conduct totally outside the range of the ordinary activity involved in the sport.

Likewise, organizational defendants, such as the association of referees and

the sports league in Karas, incur liability for failing to enforce the rules in an "organized full-contact sport" only if they "acted with intent to cause the injury or *** engaged in conduct 'totally outside the range of the ordinary activity' [citation] involved with coaching or officiating the sport." Karas, 227 Ill. 2d at 464-65, 884 N.E.2d at 137, quoting Knight, 3 Cal. 4th at 320-21, 11 Cal. Rptr. 2d at 18, 834 P.2d at 712 . In other words, organizational defendants are subject to the same standard of culpability as participants in the "full-contact sport."

## C. The Inapplicability of Karas and Pfister to Plaintiff

Defendants argue: "Without citation to any applicable authorities[,] [p]laintiff summarily concludes that the contact sports exception 'does not bar non-participants from bringing actions based on ordinary negligence because it only deals with the duties that players and their sports organizations have to other players in games of contact sports.'" (Defendants quote from plaintiff's brief.) We disagree that this conclusion by plaintiff is either summary or unsupported by citation of applicable authorities. Plaintiff cites Karas, Pfister, our decision in Nabozny v. Barnhill, 31 Ill. App. 3d 212, 334 N.E.2d 258 (1975), and the First District's decision in Azzano v. Catholic Bishop of Chicago, 304 Ill. App. 3d 713, 710 N.E.2d 117 (1999). All of those cases discuss the duty that players owe other players in contact sports (Karas, 227 Ill. 2d at 451, 884 N.E.2d at 129-30; Pfister, 167 Ill. 2d at 420, 657 N.E.2d at 1015; Nabozny, 31 Ill. App. 3d at 215, 334 N.E.2d at 261; Azzano, 304 Ill. App. 3d at 716, 710 N.E.2d at 119) or the duty that players and organizational defendants owe other players in full-contact sports (Karas, 227 Ill. 2d at 459, 464-65, 884 N.E.2d at 134, 137). As plaintiff observes, however, none of those cases discusses the duty that

- 9 -

organizational defendants owe to spectators, and none of those cases purports to bar spectators from suing organizational defendants for negligence. By making that observation, plaintiff does not resort to a summary conclusion; she merely describes, quite accurately, the content of those cases.

In response to plaintiff's observation that Karas, Pfister, and similar cases say nothing about the duty that sports organizations and promoters of games owe to spectators, defendants assert that Karas is "controlling precedent" because it "applied the contact sports exception to allegations of non-participant misconduct." Although it is true that, in Karas, the supreme court held that the exception to tort liability for negligence extended to organizational defendants in full-contact sports (at least with respect to their alleged failure to enforce rules), defendants give insufficient attention to the difference between Karas, 227 Ill. 2d at 442, 884 N.E.2d at 124, and the present case: in Karas, the plaintiff was a participant in the sport, an ice-hockey player, whereas, in the present case, plaintiff was a spectator watching the game from behind a wall, where defendants had directed her to be. The real question before us is, Against what kind of plaintiff does the exception for full-contact sports operate? not What kind of defendant may benefit from the exception? In other words, merely insisting that nonparticipating organizational defendants benefitted from the exception in Karas does not answer plaintiff's argument: that Karas is distinguishable because the plaintiff in that case was a participant in a full-contact sport, whereas plaintiff in the present case was a spectator.

Given the supreme court's reasoning in Pfister and Karas, we conclude that merely watching a football game, as a spectator, from behind a wall provided by defendants

does not trigger the exception for contact sports or full-contact sports. In its rationale for limiting participants' liability in contact sports, the supreme court explained:

"Those who participate in *** football *** choose to play games in which physical contact among participants is inherent in the conduct of the game. Participants in such games assume a greater risk of injury resulting from negligent conduct of co[-]participants. ***

* * *

*** The contact sports exception allows recovery for injuries resulting from willful and wanton and intentional misconduct while taking into account the voluntary nature of participation in games where physical contact is anticipated and where the risk of injury caused by this conduct is inherent." Pfister, 167 Ill. 2d at 426-27, 657 N.E.2d at 1018.

Thus, it was significant to the supreme court that participants in a contact sport had an expectation or understanding--perhaps even an implied agreement among themselves--that the game they voluntarily were going to play would involve bodily contact, including bodily contact that was negligent. See Karas, 227 Ill. 2d at 465, 884 N.E.2d at 137 (whether the contact-sports exception applies to a nonparticipant defendant is a policy determination that depends in part on the circumstances of the sport and its inherent risks as well as the relationship of the parties to the sport and to each other). The college students in Pfister assumed the risk of this bodily contact in their impromptu game of kick

- 11 -

the can--or perhaps we could put it more strongly: they eagerly embraced the risk as part of the thrill and fun of the game.

Of course, this rationale of assuming the risk applies just as readily to full-contact sports. In fact, in Karas, 227 Ill. 2d at 452, 884 N.E.2d at 130, the supreme court quotes the passage from Pfister that we quoted in the preceding paragraph but further observes that in full-contact sports, the participants actually share an expectation that they will make bodily contact in deliberate disregard of each others' safety (Karas, 227 Ill. 2d at 456, 884 N.E.2d at 132). It seems improbable, by contrast, that spectators watching the game from behind a wall have the same understanding with the football players that the players have with each other. Surely, spectators do not buy tickets and take their place behind the wall with the understanding that they, too (just like, say, the quarterback or wide receiver), will be tackled, rammed, and crushed--any more than they have the understanding that they may cross the wall and inflict those bodily contacts on the players.

For the sake of the game, it is desirable that football players tackle, push, and block one another with full energy and uninhibited vigor, but few would argue that collisions between the players and fans do the game any good. As the supreme court noted in Karas, 227 Ill. 2d at 452-53, 884 N.E.2d at 130, imposing a duty on football players to refrain from negligently injuring one another would fundamentally alter the game, turning it into a timid exercise. Requiring defendants in the present case, however, to exercise ordinary care for the safety of spectators, such as by erecting a higher wall or warning them of the danger of players' falling over the wall, surely would not have a chilling effect on the way the players play the game. One may assume that, by and large, football players are men

of ordinary sensibilities who deeply regret any injury to fans and, therefore, a slightly higher wall or a heads-up to fans would, if anything, make them feel freer to push the opposing player out of bounds with the utmost abandon. Arguably, players would feel less "chilled."

In addition to the chilling effect on the sport, the supreme court, in Karas, was concerned that making participants and organizational defendants liable to coparticipants for negligence would cause a surfeit of litigation, with players suing one another for every turned ankle and black eye. Karas, 227 Ill. 2d at 453, 884 N.E.2d at 130-31. We find this rationale to be likewise inapplicable to the present case because we have no reason to believe that injuries to spectators at football games, resulting from the negligence of the possessor of the premises, are so commonplace that providing a remedy for such negligence would cause an avalanche of lawsuits.

D. Collisions With Bystanders on the Sidelines

We acknowledge that any reasonable person standing on the sidelines during a football game, with nothing separating him or her from the players except a line of chalk drawn on the ground, should perceive the risk of getting hit. The danger of being struck by hurtling human bodies should be almost as palpable to that bystander as to the players.

We are unconvinced, however, that plaintiff in the present case is comparable, for instance, to the videographer crouching in the end zone in Gallagher v. Cleveland Browns Football Co., 93 Ohio App. 3d 449, 638 N.E.2d 1082 (1994), rev'd, 74 Ohio St. 3d 427, 659 N.E.2d 1232 (1996). The job of a videographer was, as the Court of Appeals of Ohio observed, "inherently dangerous." Gallagher, 93 Ohio App. 3d at 460, 638 N.E.2d at

1089. "Covering football games was inherently dangerous because it was common for football players to run out of bounds during games and collide with media people who were kneeling or standing. The risk was greatest near the end zones because [they were] the players' ultimate destination." Gallagher, 93 Ohio App. 3d at 455, 638 N.E.2d at 1086. "The risk of a collision [was] ordinary to the game of football because players advance[d] for the ball and[,] when advancing[,] they collide[d] with spectators and participants, which [was] the nature of the sport. The danger [was] known to all, especially those who roam[ed] the sidelines every game day jockeying for a good position to tape the game." Gallagher, 93 Ohio App. 3d at 459-60, 638 N.E.2d at 1089. Consequently, the appellate court reversed the judgment in the videographer's favor, holding that under the doctrine of primary assumption of risk, the corporate owners of the Cleveland Browns and the Cleveland Stadium owed the videographer no duty. Gallagher, 93 Ohio App. 3d at 463, 638 N.E.2d at 1091.

The Supreme Court of Ohio reversed the appellate court's judgment on procedural grounds, because the defendants had failed to raise the defense of primary assumption of risk in a timely manner and had thereby forfeited the defense. Gallagher, 74 Ohio St. 3d at 430, 659 N.E.2d at 1235. In the course of its decision, the supreme court made the following illuminating remarks regarding the concept of primary assumption of risk:

"Because of the great impact a ruling in favor of a defendant on primary assumption of risk grounds carries, a trial court must proceed with caution when contemplating

whether primary assumption of risk completely bars a plaintiff's recovery. Indeed, in Cincinnati Baseball Club Co. v. Eno (1925), 112 Ohio St. 175, 147 N.E. 86, the case cited in [Anderson v. Ceccardi, 6 Ohio St. 3d 110, 451 N.E.2d 780 (1983),] as support for the survival of the concept of primary assumption of risk, the doctrine itself was inapplicable, as plaintiff there was a spectator injured by a ball hit by a player who was practicing very near the stands. The Eno court intimated in dicta that primary assumption of risk would have applied if plaintiff had been struck by a ball hit into the stands during the normal course of a game: '[I]t is common knowledge that in baseball games hard balls are thrown and batted with great swiftness, that they are liable to be thrown or batted outside the lines of the diamond, and that spectators in positions which may be reached by such balls assume the risk thereof.' Eno, 112 Ohio St. at 180-81, 147 N.E. at 87. Eno demonstrates that only those risks directly associated with the activity in question are within the scope of primary assumption of risk, so that no jury question would arise when an injury resulting from such a direct risk is at issue, meaning that no duty was owed by the defendant to protect the plaintiff from that specific risk. In many situations, as in Eno, there will be

attendant circumstances that raise questions of fact whether an injured party assumed the risk in a particular situation. In that case, the doctrine of implied assumption of risk, not primary assumption of risk, would be applicable." Gallagher, 74 Ohio St. 3d at 432, 659 N.E.2d at 1237.

Hence, a finding of primary assumption of risk is equivalent to a finding that, under the facts of the case, the defendant owed the plaintiff no duty. Further, the Supreme Court of Ohio warned, a court should be careful to make that finding only if the risk of injury was so widely known to be inherent in the plaintiff's activity that a jury would have nothing to decide. In many cases, because of the attendant circumstances, the question of assumption of risk will not be so straightforward--it will be a question for the jury.

Setting aside the problem that the Supreme Court of Ohio reversed the appellate court's judgment in Gallagher, neither the appellate court's decision nor the supreme court's decision in that case offers much support for applying the doctrine of primary assumption of risk to the case before us. About the only similarity between the two cases is that a spectator at a football game got hit. Unlike videographers crouching in the end zone, however, it is unclear that spectators behind a wall at an arena football game commonly know they are at risk of injury. One might infer that the purpose of this wall was to protect spectators from being struck by players. Absent any warnings, the wall might lull a spectator into a false sense of security.

By contrast, the basketball player in Yarber v. Oakland Unified School District, 4 Cal. App. 4th 1516, 6 Cal. Rptr. 2d 437 (1992), another case that defendants cite,

could not have been lulled into a false sense of security, because the danger of playing basketball, with an unpadded concrete wall only four feet behind the end line, was obvious. The plaintiff was playing adult basketball in a junior high school gymnasium, which he and other players in the community basketball league had rented from the school district. Yarber, 4 Cal. App. 4th at 1518, 6 Cal. Rptr. 2d at 437-38. While the plaintiff was shooting, another player ran into him, propelling him into the wall behind the basketball goal, with the result that the plaintiff sustained injuries to his head and neck. Yarber, 4 Cal. App. 4th at 1518, 6 Cal. Rptr. 2d at 438. The plaintiff sued the school district, apparently on the theory that an unpadded concrete wall so close to the end line of a basketball court was a dangerous condition. Although the plaintiff won a judgment in the trial court (Yarber, 4 Cal. App. 4th at 1518, 6 Cal. Rptr. 2d at 438), the appellate court reversed the judgment on the ground that California Government Code section 831.7(a) (Cal. Gov't Code §831.7(a) (Deering Supp.)) immunized the school district from liability (Yarber, 4 Cal. App. 4th at 1519, 6 Cal. Rptr. 2d at 437).

Section 831.7(a) provided as follows:

"'(a) Neither a public entity nor a public employee is liable to any person who participates in a hazardous recreational activity, including any person who assists the participant, or to any spectator who knew or reasonably should have known that the hazardous recreational activity created a substantial risk of injury to himself or herself and was voluntarily in the place of risk, or[,] having the ability to do

so[,] failed to leave, for any damage or injury to property or persons arising out of that hazardous recreational activity.'" (Emphasis in original.) <u>Yarber</u>, 4 Cal. App. 4th at 1519, 6 Cal. Rptr. 2d at 438, quoting Cal. Gov't Code §831.7(a) (Deering Supp.).

Subsection (b) defined a "hazardous recreational activity" as an activity that "'create[d] a substantial (as distinguished from a minor, trivial[,] or insignificant) risk of injury to a participant.'" <u>Yarber</u>, 4 Cal. App. 4th at 1519, 6 Cal. Rptr. 2d at 438, quoting Cal. Gov't Code §831.7(b)(3) (Deering Supp.). The term included "'body contact sports (<u>i.e.</u>, sports in which it [was] reasonably foreseeable that there [would] be rough bodily contact with one or more participants).'" <u>Yarber</u>, 4 Cal. App. 4th at 1519, 6 Cal. Rptr. 2d at 438, quoting Cal. Gov't Code §831.7(b)(3) (Deering Supp.).

The appellate court held that basketball was a "hazardous recreational activity" as defined by section 831.7 (Cal. Gov't Code §831.7 (Deering Supp.)), the injury that the plaintiff sustained was an inherent risk of the sport, and the school district was therefore statutorily immune from liability. <u>Yarber</u>, 4 Cal. App. 4th at 1520, 6 Cal. Rptr. 2d at 439. In support of its holding, the appellate court explained:

"[T]he risk of injury is not confined to the boundaries of the court. The risk inherent in the game extends beyond those lines and involves common occurrences, as when a player is shoved out of bounds[] or his momentum[,] when diving for the ball or driving to the basket[,] propels him past the base

- 18 -

line. An interested person need only turn on one of the week's many televised basketball games to see players falling, running[,] or being pushed out of bounds[,] onto reporters' tables, television cameras[,] or fans seated near the court. Running into obstacles close to the sidelines must be considered an inherent risk of the game. The danger of an unpadded concrete wall, four feet beyond the boundaries, should have been apparent to anyone playing a full-court game of basketball in that gym." Yarber, 4 Cal. App. 4th at 1520, 6 Cal. Rptr. 2d at 439.

Thus, the reason why the danger of the unpadded wall, four feet behind the end line, should have been apparent to anyone was that basketball players were propelled out of bounds and into such objects all the time. Nothing but a few feet of space separated basketball players from people and things surrounding the basketball court, and hence collisions with these people and things were "common occurrences."

We concede that football players, like basketball players, commonly run out of bounds and that anyone standing on or near the sidelines, with nothing between them and the football players but thin air, should reasonably perceive the danger of getting hit. We cannot legitimately take judicial notice, however, that in arena football games, football players tumble over walls and into spectators with great frequency, the way basketball players run out of bounds and collide with spectators sitting out in the open, at court level, with no barrier between them and the players. In other words, defendants' equation of

standing on the sidelines with standing behind a wall is problematic. It is unclear that, in indoor football, spectators watching from behind a wall get hit by football players with such frequency as to warrant the conclusion that these player-spectator collisions are inherent in the sport, or in very nature of football, and that defendants therefore owe the spectators no duty to take reasonable precautions to protect them against such collisions. See <u>Murdy v. Edgar</u>, 103 Ill. 2d 384, 394, 469 N.E.2d 1085, 1090 (1984) (courts may take judicial notice only of facts which are commonly known or of facts which, though not commonly known, are readily verifiable from sources of indisputable accuracy).

E. The Duty That Defendants Owed Plaintiff

Illinois law has long recognized that certain special relationships may give rise to a duty to protect another against an unreasonable risk of physical harm. <u>Marshall</u>, 222 Ill. 2d at 438, 856 N.E.2d at 1058. The supreme court has adopted section 314A of the Restatement (Second) of Torts (Restatement (Second) of Torts §314A, at 118 (1965)), which sets forth these special relationships. <u>Marshall</u>, 222 Ill. 2d at 438, 856 N.E.2d at 1058. That section provides as follows:

"§314A Special Relations Giving Rise to Duty to Aid or Protect

(1) A common carrier is under a duty to its passengers to take reasonable action

(a) to protect them against unreasonable risk of physical harm, and

(b) to give them first aid after it knows or has reason to know that they are ill or injured,

and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to his guests.

(3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." Restatement (Second) of Torts §314A, at 118 (1965).

Comment d states that "[t]he duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct, or the condition of his land or chattels. It extends also to risks arising from *** the acts of third persons, whether they be innocent, negligent, intentional, or even criminal." Restatement (Second) of Torts §314A, Comment d, at 119 (1965).

The amended complaint does not reveal whether the football player who fell on plaintiff was a member of the Springfield Stallions or a "third person," that is, a member of the opposing team. Nonetheless, in any event, defendants, as the possessors of the premises, had a special relationship with plaintiff, their invitee--a relationship that obliged them to take reasonable action to protect her against an unreasonable risk of injury either from the conduct of their agents or the conduct of third persons. According to the amended

- 21 -

complaint, defendants possessed the auditorium of the Convention Center and held it open to members of the public, and plaintiff entered the auditorium in response to defendants' invitation. Therefore, contrary to the trial court's holding, defendants' duty toward plaintiff was not merely to refrain from willful and wanton misconduct but to take reasonable action to protect her against an unreasonable risk of physical harm--in other words, to refrain from negligence. See Restatement (Second) of Torts §302A, at 86 (1965).

### F. Primary Assumption of Risk Versus Contributory Fault

Although we find no primary assumption of risk, we do not mean to foreclose defendants from pleading and proving contributory fault. "Primary assumption of risk" is merely another way of saying that the defendant owed the plaintiff no duty because by freely agreeing to participate in the sport, the plaintiff impliedly assumed the risks inherent in the sport (Davenport v. Cotton Hope Plantation Horizontal Property Regime, 333 S.C. 71, 80-81, 508 S.E.2d 565, 570 (1998); Turcotte v. Fell, 68 N.Y.2d 432, 438, 502 N.E.2d 964, 967-68, 510 N.Y.S.2d 49, 53 (1986)) and it would be detrimental to the sport and unfair to the other participants to allow the plaintiff to go back on that assumption of risk (Karas, 227 Ill. 2d at 456-57, 884 N.E.2d at 133). As we have explained, the doctrine of primary assumption of risk is inapplicable to this case because (1) plaintiff was a spectator rather than a participant in the football game and (2) we have no reason to think that collisions between football players and spectators are commonplace and inherent in arena football.

Nevertheless, we do not mean to bar an affirmative defense, under section 2-1116 of the Code (735 ILCS 5/2-1116 (West 2006)), that contributory fault on the part of plaintiff was a proximate cause of her injuries. See 735 ILCS 5/2-1116(b) (West 2006)

- 22 -

(defining "contributory fault" as "any fault on the part of the plaintiff (including but not limited to negligence, assumption of the risk, or willful and wanton misconduct) which is a proximate cause of the *** bodily injury to person *** for which recovery is sought"); Blackburn v. Johnson, 187 Ill. App. 3d 557, 565, 543 N.E.2d 583, 588 (1989) (comparative negligence is an affirmative defense). Whereas primary assumption of risk is a question of law for the court because it concerns the scope of the defendant's duty (Forsythe v. Clark USA, Inc., 224 Ill. 2d 274, 280, 864 N.E.2d 227, 232 (2007); Karas, 227 Ill. 2d at 453-54, 884 N.E.2d at 131), comparative negligence ordinarily is a question of fact for the jury (West v. Kirkham, 207 Ill. App. 3d 954, 958, 566 N.E.2d 523, 525 (1991)).

### III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment and remand this case for further proceedings.

Reversed and remanded.

KNECHT and POPE, JJ., concur.