# Illinois Official Reports

## Appellate Court

*In re Marriage of Baumgartner*, 2014 IL App (1st) 120552

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF SUSAN LYNN BAUMGARTNER, Petitioner-Appellant, and CRAIG BAUMGARTNER, Respondent-Appellee. |
| District & No. | First District, Sixth Division<br>Docket Nos. 1-12-0552, 1-12-0779 cons. |
| Filed | March 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In postjudgment proceedings arising from the dissolution of the parties' marriage, the trial court properly denied petitioner's petition seeking the enforcement of the provision of the dissolution judgment requiring the parties to pay for their son's college expenses and properly granted respondent's petition to terminate that obligation, since the trial court correctly determined the son was emancipated and lacked the desire and ability to pursue a college education, and, furthermore, petitioner's request for an adjudication of indirect criminal contempt against respondent was properly dismissed in view of petitioner's failure to establish any court order that respondent violated. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 1997-D-019363; the Hon. Jeanne Marie Reynolds, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Richard B. Kirk, of Schirger Law Offices, LLC, of Rockford, for appellant.

Julie Campbell, of Poulos Black PC, of Evanston, for appellee.

Panel

JUSTICE HALL delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

**OPINION**

The petitioner, Susan Lynn Baumgartner (Susan), appeals from orders of the circuit court of Cook County denying her amended petition to enforce the post high school educational provisions of the judgment for dissolution of marriage and granting the amended cross-petition of the respondent, Craig Baumgartner (Craig), terminating the parties' obligation to provide those expenses for the parties' son, Maxwell Baumgartner (Max). In a separate appeal, Susan appeals from the dismissal of her petition for adjudication of indirect criminal contempt against Craig. The two appeals have been consolidated for review.

On appeal, Susan contends that: (1) the trial court erred when it considered Craig's reinstated petition; (2) the evidence supported the enforcement of the dissolution judgment's educational support provision for Max; and (3) the trial court erred when it *sua sponte* ordered her contempt petition against Craig stricken. For the reasons stated below, we affirm the judgment of the circuit court.

BACKGROUND

I. Procedural History

A brief history of this litigation is necessary to place the issues raised on appeal in the proper context. The marriage of the parties was dissolved in 1998. See *In re Marriage of Baumgartner*, 384 Ill. App. 3d 39 (2008) (*Baumgartner I*) (upholding the trial court's orders resolving postjudgment child support and related issues). A provision in their marital settlement agreement, which was incorporated into the judgment for dissolution of marriage, provided as follows:

> "2.16 CRAIG and SUSAN shall be responsible for post high school educational expenses for [Max] as provided by the applicable section of the Illinois Marriage and Dissolution of Marriage Act in force when Max is ready to incur these expenses. CRAIG shall continue to maintain the Florida Pre-Paid tuition and dorm college account with combined deposits currently valued at $4000.00. The Parties' obligation for college educational expenses will be reduced by the value of this account when Max begins his post high school education.

2.17 The Parties' obligation in this regard shall only be conditioned upon the ability to pay these expenses when incurred, and [Max's] desire and ability to further his education."

¶ 6 Following his 2005 graduation from New Trier High School (New Trier), Max briefly attended Oakton Community College (Oakton). In 2007, he was charged with and subsequently convicted of two felonies and sentenced to prison for three years. In 2008, Craig filed a petition seeking to terminate the parties' obligation under the dissolution judgment to fund Max's post high school educational expenses. The circuit court terminated Craig's obligation to contribute to Max's post high school educational expenses on the sole basis of Max's incarceration.

¶ 7 A majority of this court reversed the circuit court's order, holding that there was no authority in Illinois that recognized incarceration as a self-emancipating event such as marriage or military service. See *In re Marriage of Baumgartner*, 393 Ill. App. 3d 297 (2009) (*Baumgartner II*) (Wolfson, J., dissenting). Craig's petition for leave to appeal to our supreme court was granted.

¶ 8 On review, the supreme court affirmed our decision and remanded the case to the circuit court. Holding that Max's criminal activity, by itself, was not dispositive as to whether Max was emancipated, the court noted that the record contained no evidence pertaining to Susan's and Craig's care, custody, control and support of Max and whether Max voluntarily abandoned that support. The court instructed the circuit court to consider "the extent to which Max's incarceration constitutes changed circumstances, warranting a modification of the dissolution judgment for both parties." *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 488 (2010) (*Baumgartner III*).

¶ 9                                    II. Hearing on Remand

¶ 10 On remand, the trial court held a hearing on Susan's amended petition to enforce the educational expenses provision of the judgment and Craig's amended cross-petition to terminate the parties' obligation for those expenses. The following is a summary of the relevant testimony.

¶ 11                                            A. Craig

¶ 12 In 2004, when Max was a junior at New Trier, Craig, who resided in California, wrote to Max, Susan and Susan's husband, Stephen Ginensky (Stephen), advising them of the availability of the Florida prepaid college plan (the Florida plan). He reminded them that in response to his earlier questions concerning Max's preparation and plans for college, they had told him that those issues were being addressed. After Craig received no response to the letter, he sent a follow up e-mail, which included the names of and contact information for Max's post high school counselors. He did not receive a response to his e-mail.

¶ 13 Craig had no communication with Max after Max graduated from New Trier in 2005. Craig obtained Max's transcripts from his senior year at New Trier, which showed that Max graduated at the bottom of his class. In searching the Internet, Craig learned that Max was attending Oakton in the fall of 2005, and he obtained a transcript of Max's grades at Oakton: English 101–D, English 102–F, psychology–B, and sociology–F. Max's grade-point average was 1.00. Neither Max nor Susan requested to use the Florida plan to pay for the tuition at

Oakton, and neither of them informed Craig that Max also took classes at Oakton in 2007. Max's 2007 transcript from Oakton showed the following courses and grades: he repeated English 102 and received an F, Introduction to Philosophy–D, Psychology of Abnormal Behavior–D. His grade-point average for 2007 was 1.00.

¶ 14 In 2006 and 2007, Craig was notified by a family member that Max had been arrested. The parties stipulated that Max was convicted of two felonies, for which he served time in prison.

¶ 15 In 2008, Craig filed his petition to terminate the parties' obligation for Max's college expenses. His request for termination was based on Max's failure to exhibit any desire or ability to attend college and Max's failure to communicate with him about his plans for his post high school education. After the circuit court terminated his educational support obligation for Max, on the advice of his attorney, Craig terminated the Florida plan account. Craig was never informed that Max wished to use the Florida plan for college until 2010, when Susan filed her petition to enforce the educational payment provisions of the dissolution judgment.

¶ 16 After Max was released from prison in 2009, Craig learned from the Internet that Max was engaged to be married and had a son, Kaiden Maxwell Baumgartner, born January 5, 2010. The parties stipulated that Kaiden was Max's son, and the mother was Ashley Nicole Little (Ashley). Craig maintained it would be a financial hardship if he were ordered to pay Max's college expenses.

¶ 17 Craig acknowledged that the educational expenses provision in the dissolution judgment did not require Max to utilize the Florida plan or to notify Craig that he wished to use it. He did not know what Max's class rank was when he graduated from New Trier. The Florida plan was fully paid for in July 2005. Craig was never required to provide the plan with Max's address. When Craig received information regarding the Florida plan, he forwarded it to Max. Following Max's graduation from New Trier, Susan, Stephen and Max moved but did not notify Craig of their new address. The trial court observed that there was documentation that Craig had the means to contact Susan.

¶ 18                                 B. Susan

¶ 19 Susan did not recall receiving Craig's 2004 letter or the follow up e-mail he sent. After Max graduated from New Trier, she did not keep in contact with Craig. Susan did not believe that the Florida plan could be used for Max's Oakton expenses, but she never contacted the plan to confirm that it could not be used. Susan did not remember when she first notified Craig that Max wanted to attend college. After his release from prison in January 2009, Max could not get a job, and he needed to go back to school. Susan filed her petition to enforce the payment of Max's educational expenses because she wanted him to go to college.

¶ 20 Susan had been unemployed for the previous two years. Max lived with Susan and Stephen, but Susan had no proof of any expenses for him that she paid.

¶ 21 According to Susan, Max was very immature when he attended Oakton in 2005, and his study habits were poor. Susan talked to Max about his grades at Oakton but did not remember what she said to him. She was aware of the Florida plan and was sure she discussed it with Max. Susan acknowledged that Ashley lived with her while she was pregnant with Kaiden, but she could not recall when or for how long. While Max and Ashley were "engaged," Max told Susan that he did not think they would marry.

¶ 22    Max had not yet applied to any four-year college or university. In 2011, he attended Rock Valley Community College (Rock Valley), but Susan could not afford the tuition for the summer term. The trial court noted that Craig had paid for Max to attend Rock Valley for a semester. While at Rock Valley, Max received two A's, a B and a C, though Susan could not recall what courses he took. He also took classes while he was in prison. Susan believed that Max wanted to complete a four-year degree.

¶ 23                                        C. Max

¶ 24    Max explained that he would like to pursue a master's degree and then a doctorate in the area of science. He understood he needed to obtain a baccalaureate degree first. He was attending a two-year school to get his grade-point average up so he could be considered by a four-year institution. At Rock Valley, he had received an A in sociology, a C in pre-calculus, a B in student study skills, and an A in philosophy. He received A's and B's in the classes he completed while in prison. Max maintained that he valued education more now than he did when he attended Oakton.

¶ 25    While he was attending New Trier, Max was aware of the Florida plan but did not remember discussing the plan with Susan. He did not contact Craig to ask how to use the plan. Max did not notify Craig that he was attending Oakton. Stephen paid his tuition there; Max was not required to reimburse him.

¶ 26    At the time of the hearing, Max was employed earning $15 per hour, which was paid to him in cash. He intended to find another job with more earning potential but had not submitted any applications. Max acknowledged that he did not have a driver's license, but it did not matter because he could not afford the insurance to drive a car. Max supported Kaiden by giving Ashley $20 or $40 a month. Max did not intend to apply to a four-year college until he knew how he was going to pay for it. He did look into obtaining financial aid.

¶ 27    According to Max, Ashley and he were engaged, and he had given her a ring. He acknowledged telling Susan that he was not going to marry Ashley. Max admitted that he repeated classes at Rock Valley that he had taken elsewhere. He did not check before he took them to see if he could receive credit for those classes he had previously taken, rather than repeat them. Max acknowledged that he would need to retake tests, such as the Scholastic Aptitude Test (SAT), because his original scores were too old to submit. He planned to retake those tests when he applied to four-year colleges.

¶ 28    On January 6, 2012, the trial court issued its written order, ruling on the parties' respective petitions. Based on the evidence, the court found that Max did not have the "requisite desire and ability to further his post-secondary education," and that he was emancipated and capable of supporting himself.

¶ 29    The trial court granted Craig's amended cross-petition and terminated the parties' obligation to fund Max's post high school education. Susan's amended petition to enforce the educational provisions of the dissolution judgment was denied. On January 27, 2012, Susan filed her notice of appeal from the January 6, 2012, order. Also on January 27, 2012, Susan filed a motion for a hearing on her previously filed petition to have Craig held in indirect criminal contempt of court for closing the Florida plan and a motion for a hearing on her previously filed petition for attorney fees.

¶ 30    On February 9, 2012, the trial court ordered Susan's contempt petition stricken. The court further ordered Susan's petition for fees entered and continued until the resolution of her appeal from its January 6, 2012, order. Craig's motion for penalties and sanctions pursuant to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2010)) (the Code) and Illinois Supreme Court Rule 137 (Ill. S. Ct. R. 137 (eff. Feb. 1, 1994)) was continued for hearing to March 22, 2012. On March 9, 2012, Susan filed a notice of appeal from the February 9, 2012, order striking her contempt petition. On March 22, 2012, the trial court denied Craig's motion for penalties and sanctions.

¶ 31                                ANALYSIS
¶ 32                              I. Jurisdiction
¶ 33    Even if the parties fail to raise the issue, a reviewing court has the duty to consider *sua sponte* its jurisdiction to rule on the merits of an appeal. *Revolution Portfolio, LLC v. Beale*, 341 Ill. App. 3d 1021, 1024-25 (2003). In the absence of jurisdiction, an appeal must be dismissed. *Revolution Portfolio, LLC*, 341 Ill. App. 3d at 1025.

¶ 34    Pending at the time these appeals were filed was Susan's amended petition for attorney fees she incurred in the prior appeals to this court and the supreme court in this case. In her jurisdictional statement, Susan stated that this court had jurisdiction pursuant to Illinois Supreme Court Rules 301 (Ill. S. Ct. R. 301 (eff. Feb. 1, 1994)) and 303 (Ill. S. Ct. R. 303 (eff. June 4, 2008)), because her appeals are from final orders of the trial court entered on January 6, 2012, and March 9, 2012. Generally, where the order appealed from resolves less than all of the claims raised in the case, a finding pursuant to Illinois Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) is required. No Rule 304(a) finding was made in this case.

¶ 35    In *In re Marriage of Demaret*, 2012 IL App (1st) 111916, this court addressed the question of "whether postdissolution petitions should be treated as new claims of the original dissolution action, mandating a Rule 304(a) finding when fewer than all pending petitions are resolved, or as separate actions under Rule 301, if the pending petitions are not related." *Demaret*, 2012 IL App (1st) 111916, ¶ 35. This court agreed with the Third District Appellate Court's holding in *In re Marriage of A'Hearn*, " 'that postdissolution proceedings are generally new actions.' " *Demaret*, 2012 IL App (1st) 111916, ¶ 35 (quoting *In re Marriage of A'Hearn*, 408 Ill. App. 3d 1091, 1097 (2011)). In *Demaret*, the petitioner's appeal from the denial of her petition to remove the minor children did not require a Rule 304(a) finding because the respondent's pending petition for attorney fees for defending the removal petition was wholly unrelated to the issues presented in the removal petition. *Demaret*, 2012 IL App (1st) 111916, ¶ 38; see *In re Marriage of Dianovsky*, 2013 IL App (1st) 121223 (distinguishing *Demaret* and *A'Hearn* where the pending petition for rule to show cause was related to the support orders that were the subject of the appeal).

¶ 36    Likewise, in the present case, Susan's pending petition for fees incurred in the appeals' process was unrelated to the determination of the parties' obligation to provide educational expenses for Max. We conclude that we have jurisdiction to consider these appeals.

¶ 37                         II. Supreme Court Rule 369
¶ 38    Susan contends that the trial court should not have conducted any proceedings on Craig's amended cross-petition because he failed to comply with the notice requirement of Illinois

Supreme Court Rule 369(c) (Ill. S. Ct. R. 369(c) (eff. July 1, 1982)). Rule 369(c) provides as follows: "When the reviewing court remands the case for a new trial or hearing and the mandate is filed in the circuit court, the case shall be reinstated therein upon 10 days' notice to the adverse party."

¶ 39    The supreme court's mandate was filed in the circuit court of Cook County on July 1, 2010. On August 19, 2010, Susan filed a petition for payment of Max's college expenses pursuant to the judgment for dissolution of marriage. On August 23, 2010, Craig's attorney filed an appearance and a notice of Craig's motion to amend the judgment to be presented on September 16, 2010, well within the 10 days' notice requirement of Rule 369(c). However, on September 16, 2010, Craig was granted leave to withdraw his motion to amend the judgment and to file his cross-petition to terminate the parties' obligation to fund Max's college expenses. On December 9, 2010, the circuit court granted Craig leave to file an amended cross-petition in which, *inter alia*, he explained that he was not pursuing the remanded case because Max had reached the age of 23, and to Craig's knowledge, Max was not pursuing any post high school education.

¶ 40    In light of Craig's acknowledgement that he was not pursuing the remanded case, we need not address Susan's arguments that he failed to comply with Rule 369(c) or that proceedings failed to comply with the supreme court's mandate. The proceedings in this case were begun by Susan's August 19, 2010, petition to enforce the educational provision of the judgment for dissolution of marriage to which Craig responded by filing a cross-petition. The trial court obtained jurisdiction over these proceedings when Susan filed her petition. See *Hynes v. Department of Revenue*, 269 Ill. App. 3d 697, 712 (1995) (the plaintiffs invoked the jurisdiction of the circuit court by filing their complaint). The court had jurisdiction over Craig when his attorney filed a general appearance on his behalf. See *In re Marriage of Gorman*, 284 Ill. App. 3d 171, 178 (1996) (personal jurisdiction over the defendant is acquired by service of summons or by general appearance).

¶ 41    We conclude that Susan's contentions with regard to Rule 369(c) and the jurisdiction of the trial court to consider this case are moot in light of Craig's abandonment of the reinstatement of his 2008 petition and the filing of Susan's August 19, 2010, petition for the payment of Max's educational expenses.

¶ 42                    III. Appeal No. 1-12-0552: Educational Expenses

¶ 43    Susan contends that the trial court erred when it issued its January 6, 2012, order terminating the parties' obligation to provide Max with a post high school education. She argues that the evidence was insufficient to establish that Max was emancipated. Susan further argues that the manifest weight of the evidence established that Max had the desire and ability to further his education.

¶ 44                              A. Standard of Review

¶ 45    "A provision for payment of college expenses is in the nature of child support and is modifiable." *Hupe v. Hupe*, 305 Ill. App. 3d 118, 125 (1999). Modification of a dissolution of marriage judgment rests in the sound discretion of the trial court; as a reviewing court, we will not interfere with the exercise of that discretion in the absence of its abuse. *In re Marriage of Walters*, 238 Ill. App. 3d 1086, 1096 (1992). An abuse of discretion will be found only where no reasonable person would take the view adopted by the trial court. *In re Marriage of*

*Schneider*, 214 Ill. 2d 152, 173 (2005).

¶ 46                                    B. Discussion

¶ 47      In terminating the parties' obligation to pay the expenses of Max's post high school education, the trial court found that (1) Max was emancipated and capable of supporting himself, and (2) Max did not have the requisite desire and ability to further his post high school education.

¶ 48      Susan contends that the evidence did not establish that Max was emancipated. She relies on the holding of this court and affirmed by the supreme court that Max's incarceration was not, by itself, a self-emancipation. *Baumgartner III*, 237 Ill. 2d at 488; see *Baumgartner II*, 393 Ill. App. 3d at 301. In determining whether a minor is emancipated by any means other than reaching the age of majority, the supreme court identified the factors to be considered by the trial court, including but not limited to: "whether the minor has voluntarily left the protection and influence of the parental home, or whether the minor has otherwise moved beyond the care and control of the custodial parent; whether the minor has assumed responsibility for his or her own care, or whether the minor continues to need support; whether the minor, if self-emancipated, has become dependent on his or her parents again, thereby reverting to being unemancipated." *Baumgartner III*, 237 Ill. 2d at 486. The determination depends on the relevant facts and circumstances of each case. *Baumgartner III*, 237 Ill. 2d at 486.

¶ 49      At the time of the hearing, Max was 23 years old. The evidence established that since being released from prison, Max had lived with Susan and Stephen, his stepfather. Susan was unable to provide evidence of the expenses she paid on Max's behalf. Max testified that since being released from prison, he was employed earning $15 per hour, which was paid to him in cash. He intended to find another job with more earning potential but had not submitted any applications. Max had fathered a child, Kaiden, with Ashley, and supported Kaiden by giving Ashley $20 or $40 a month. Although Susan testified that Max told her he did not think he would marry Ashley, Max testified that they were engaged.

¶ 50      We agree with the trial court that the evidence in this case established that Max was not dependent upon Susan for his support. While he lived with Susan, there was no evidence that Max was supported financially by Susan. At the time of the hearing, Max was employed and provided support for Kaiden. The fact that he had not obtained a driver's license because he could not yet afford the insurance indicates that Susan was not supporting him by providing him with insurance and was further proof that Max was not dependent on Susan for support. Therefore, the trial court did not abuse its discretion in finding that Max was emancipated.

¶ 51      In any event, the trial court properly terminated the parties' educational support obligation based on the judgment for dissolution of marriage, which conditioned their obligation "upon the ability to pay these expenses when incurred and the child's desire and ability to further his education." Based on the evidence, particularly Max's testimony, the trial court found that Max lacked the desire and ability to further his education. We agree.

¶ 52      After graduating from New Trier in 2005, Max attended Oakton, where his grade-point average was 1.00. He did take classes while he was incarcerated. Following his release, he attended Rock Valley, where he achieved better grades, due in part to his repeating classes he had already taken. Max maintained that he wished to pursue his education at a four-year college or university and achieve a master's degree and doctorate in the area of science.

¶ 53    Max's overall educational history from high school and through the junior colleges he attended did not indicate that he would be accepted to a four-year college or university. The evidence did not establish that Max had the ability to be accepted at a four-year college or university since he did not apply to any four-year institutions. In any event, Max's desire to further his education was not borne out by the evidence. While testifying that he wished to pursue the area of science, Max had not applied to any four-year institutions or identified the colleges or universities to which he intended to apply. While he was aware he needed to repeat the standardized academic tests, he had not taken them. Although Max was aware of the Florida plan, he never contacted Craig to find out how to use the plan, and he failed to respond to Craig's attempts to contact him regarding the Florida plan. While he testified that he was attempting to get his grade-point average up, he acknowledged that he had not investigated whether he could receive credit for any of the courses which he had previously taken.

¶ 54    The evidence and the inferences from that evidence strongly support the trial court's determination that Max lacked the desire and ability to further his education. Since Max's desire and ability to further his education were criteria for the educational support provision in the judgment for dissolution of marriage, the trial court properly exercised its discretion when it modified the dissolution judgment by terminating the parties' obligation to pay for Max's post high school educational expenses.

¶ 55                IV. Appeal No. 1-12-0779: Indirect Criminal Contempt

¶ 56    In a separate appeal, Susan contends that the trial court erred when it issued its February 9, 2012, order striking her petition for indirect criminal contempt against Craig. On February 9, 2012, the trial court, pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2010)) and on its own motion, ordered Susan's contempt petition stricken. In the order, the court found that "it previously instructed [Susan] that Indirect Criminal Contempt was an inappropriate action to assert, and that [Susan] continued to assert the action despite this instruction. Specifically, the court stated that because the basis for the criminal contempt was a violation of a court order it was not criminal contempt."

¶ 57                              A. Standard of Review

¶ 58    A section 2-619.1 motion allows a litigant to file a motion to dismiss raising both pleading defects and affirmative defenses. All well-pleaded facts are taken as true, and all reasonable inferences from those facts will be construed in favor of the nonmoving party. *Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill. App. 3d 399, 402 (2009). We do not agree with the trial court that an indirect criminal contempt petition was not a basis for Susan's allegations against Craig. However, our review of a court's dismissal pursuant to section 2-619.1 of the Code is *de novo*. *Morris*, 392 Ill. App. 3d at 402. Therefore, we are not bound by the trial court's reasons for its rulings.

¶ 59                                B. Discussion

¶ 60    "The purpose of contempt proceedings is to maintain the dignity of the court and to enforce its orders by punishing contemnors for disobedience." *United Transfer, Inc. v. Lorence*, 2011 IL App (2d) 110041, ¶ 18. Criminal contempt sanctions are imposed where the contemnor's acts were in the past and cannot be rectified; indirect criminal contempt is a subcategory of criminal contempt and occurs where the contemptuous behavior was outside of the court's

- 9 -

presence. *Lorence*, 2011 IL App (2d) 110041, ¶ 18. To be found in indirect criminal contempt requires "(1) the existence of a clear court order, and (2) the willful violation of that order." *People ex rel. City of Chicago v. Le Mirage, Inc.*, 2013 IL App (1st) 093547-B, ¶ 53. To satisfy the first element, the would-be contemnor must have received fair and precise notice of what the order prohibited. *Le Mirage, Inc.*, 2013 IL App (1st) 093547-B, ¶ 53. The standard of proof is beyond a reasonable doubt. *Lorence*, 2011 IL App (2d) 110041, ¶ 18.

¶ 61 In count I of her petition, Susan alleged that on April 19, 2001, the circuit court amended the judgment for dissolution of marriage to provide that Max would reside with Susan, rather than Craig as provided in the 1998 dissolution judgment. Susan alleged that Craig violated the April 19, 2001, order when he gave changes of his address to the administrators of the Florida plan and falsely informed them that his address and telephone number was Max's address and telephone number. As a result, all communication about the plan, including the identification cards to allow Max to use the plan benefits, was sent to Craig.

¶ 62 Even accepting Susan's allegations as true, her petition fails to demonstrate the existence of an order that formed the basis of the petition for indirect criminal contempt. Nothing in section 2.16 or 2.17 of the 1998 dissolution judgment or the April 19, 2001, modification of the 1998 judgment required Craig to inform the Florida plan where or with whom Max was residing, or to provide them with Max's contact information. Craig's only obligation with regard to the Florida plan was to maintain it. In the absence of the existence of the order Craig was alleged to have violated, Susan's petition was properly dismissed. See *Lorence*, 2011 IL App (2d) 110041, ¶ 19 (dismissal of the petition for indirect criminal contempt was proper where the petition failed to demonstrate the existence of the court order alleged to have been violated).

¶ 63 In count II, Susan alleged that Craig violated the court order that he maintain the Florida plan by transferring the plan to his wife, Jeanine, who then liquidated the plan. Susan alleged that, since the transfer and liquidation occurred while her motion for reconsideration of the circuit court's order terminating Craig's obligation to provide educational support for Max was pending, his obligation to continue the Florida plan was still in effect. See 735 ILCS 5/12-1203(b) (West 2010) (following the entry of a judgment, a timely motion for reconsideration stays the enforcement of the judgment).

¶ 64 Susan alleged that Craig transferred the Florida plan to Jeanine. She failed to allege any facts that the mere transfer of the plan to Jeanine violated the requirement that Craig maintain the account for Max. "To support a finding of contempt, the order must be 'so specific and clear as to be susceptible of only one interpretation.' [Citation.] 'It must not only be capable of reasonable interpretation, but that interpretation must be to the exclusion of other reasonable interpretations; it must be unambiguous.' " *In re Marriage of Steinberg*, 302 Ill. App. 3d 845, 853 (1998) (quoting *O'Leary v. Allphin*, 64 Ill. 2d 500, 514 (1976), and *O'Grady v. Cook County Sheriff's Merit Board*, 204 Ill. App. 3d 258, 262 (1990)). Moreover, according to Susan's allegation, it was Jeanine who liquidated the plan, rendering it unavailable for Max's education. Susan did not seek a contempt finding against Jeanine or allege that Craig was responsible for her conduct.

¶ 65 Even if Craig violated the stay order, Susan must demonstrate that the violation of the order was willful. In reviewing the dismissal of a complaint we accept as true all well-pleaded facts, but we do not accept as true conclusions unsupported by allegations of fact. *Pickel v. Springfield Stallions, Inc.*, 398 Ill. App. 3d 1063, 1066 (2010). In her petition, Susan alleged

- 10 -

that Craig's violation was willful but failed to plead any facts demonstrating that Craig's violation of the stay order was willful.

¶ 66 Moreover, during the hearing on the parties' petitions, Craig testified that prior to terminating the Florida plan he consulted his tax advisor and his attorney, who advised him that he did not need to continue the Florida plan since his obligation had been terminated. He further testified that he did not terminate the Florida plan to defraud anyone.

¶ 67 Susan did not dispute Craig's testimony that he sought the advice of his attorney prior to terminating the Florida plan. In the absence of any facts supporting her allegation that Craig's violation was willful and in light of his testimony that he acted after seeking his attorney's advice, Susan's petition failed to demonstrate a factual basis to support her conclusion that Craig's alleged violation of the stay order was willful. See *Baumgartner I*, 384 Ill. App. 3d at 63-64 (even though he owed support, Craig's conduct prior to the filing of the contempt petition, including disputing the amounts owed and hiring an attorney to assist him in calculating the support amount, did not indicate that he willfully disregarded the court's support order).

¶ 68 We conclude that Susan's petition to hold Craig in indirect criminal contempt failed to demonstrate that Craig violated the court's orders or that any violation on his part was willful. Therefore, the striking of Susan's petition for indirect criminal contempt was proper.

¶ 69                                    CONCLUSION
¶ 70 For all of the forgoing reasons, the judgment of the circuit court is affirmed.

¶ 71 Affirmed.